ESTATE OF MONROE D. ANDERSON, DECEASED, THE STATE NATIONAL BANK OF HOUSTON, JAMES E. ANDERSON, WILLIAM LELAND ANDERSON AND THOMAS D. ANDERSON, EXECUTORS, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

W. L. CLAYTON, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

SUSAN V. CLAYTON, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 2581, 2613, 2614. Promulgated March 31, 1947.

*John C. White, Esq.,* and *Leon Jaworski, Esq.,* for the petitioners. *Frank B. Schlosser, Esq.,* for the respondent.

714

### OPINION.

ARUNDELL, *Judge*: At the threshold we are met with the question of whether the sales of stock by Anderson and Clayton to the six individuals actively engaged in the Anderson-Clayton business enterprise are in any event subject to gift tax. Respondent concedes that these sales were bona fide and at arm's length; but he contends that they were not made in the ordinary course of business, that the value of the stock was greater than the value of the consideration received, and that the excess is therefore taxable as a gift under section 503 of the Revenue Act of 1932.[1] He relies primarily upon *Commissioner* v. *Wemyss*, 324 U. S. 303, for the proposition that the absence of donative intent is immaterial.

It is quite true that in *Wemyss* the Supreme Court held that Congress in section 503 had dispensed with the subjective test of donative intent and substituted the more workable external or objective test of whether the consideration for the transfer is full and adequate in money or money's worth. It must not be overlooked, however, that at the same time the Court was careful to point out that genuine business transactions—"business transactions within the meaning of ordinary speech"—are not within the scope of the gift tax. Citing Treasury Regulations 79 (1936 Ed.), art. 8,[2] it said that:

* * * the Treasury Regulations make clear that no genuine business transaction comes within the purport of the gift tax by excluding "a sale, exchange,

---

[1] SEC. 503. TRANSFER FOR LESS THAN ADEQUATE AND FULL CONSIDERATION.

Where property is transferred for less than an adequate and full consideration in money or money's worth, then the amount by which the value of the property exceeded the value of the consideration shall, for the purpose of the tax imposed by this title, be deemed a gift, and shall be included in computing the amount of gifts made during the calendar year.

[2] ART. 8. *Transfers for a consideration in money or money's worth.*—Transfers reached by the statute are not confined to those only which, being without a valuable consideration, accord with the common law concept of gifts, but embrace as well sales, exchanges, and other dispositions of property for a consideration in money or money's worth to the extent that the value of the property transferred by the donor exceeds the value of the consideration given therefor. However, a sale, exchange, or other transfer of property made in the ordinary course of business (a transaction which is bona fide, at arm's length, and free from any donative intent), will be considered as made for an adequate and full consideration in money or money's worth. A consideration not reducible to a money value, as love and affection, promise of marriage, etc., is to be wholly disregarded, and the entire value of the property transferred constitutes the amount of the gift.

or other transfer of property made in the ordinary course of business (a transaction which is bona fide, at arm's length, and free from any donative intent)." * * * Thus on finding that a transfer in the circumstances of a particular case is not made in the ordinary course of business, the transfer becomes subject to the gift tax to the extent that it is not made "for an adequate and full consideration in money or money's worth."

The first issue therefore reduces itself to the question of whether the sales of common stock of corporation were "made in the ordinary course of business." Petitioners contend that the sales were so made. They argue that, while donative intent may not be material in determining whether a gift has been made, the presence or absence of donative intent is an important circumstance in determining whether a sale or other disposition of property is made in the ordinary course of business. The regulations, they say, define a transfer made in the ordinary course of business as "a transaction which is bona fide, at arm's length, and free from any donative intent."

For the purposes of deciding the first issue thus raised, we shall assume that the stock had a value in excess of the consideration.

All the sales of stock were made pursuant to what was essentially a profit-sharing plan. Profit participation by the active management was a common practice in the cotton merchandising business generally. The evidence makes clear that cotton merchandising is primarily a management business and one of the most difficult and complex merchandising operations in the world, and that the success of the business is dependent, by and large, upon efficient and well trained management having long experience in all phases of cotton merchandising.

Prior to the organization of corporation, Clayton, Fleming, and Whittington held profit sharing or commission contracts with association which yielded them large annual returns and removed considerable cash from the business. When corporation was organized, its common stock was substituted for the profit sharing contracts; and that had the two-fold effect of keeping cash in the business as invested capital and compelling the executives to acquire a proprietary interest in the business. From the beginning, the common stock of corporation was designed to be held only by persons actively engaged in the Anderson-Clayton business enterprise. Clayton and Anderson were the holders of the largest equities in the business, and the real value of their large investments in preferred stock could be maintained and preserved only by a continued efficient management. In order to build up a responsible management which could continue the business in the event of the retirement or death of Anderson or Clayton, they believed it essential that the junior executives acquire proprietary interests in the business and that such proprietary interests should grow in proportion to the shifting of responsibilities from the seniors to the juniors.

And so the plan was put into operation upon the organization of corporation. All the common stockholders understood that the relative proportions of their holdings would change from time to time as responsibilities were shifted from the older to the younger executives. At the beginning of each cotton season it was customary to reexamine the management situation and the relative contributions to management on the part of the several executives and to determine what readjustments, if any, in the relative ownership of common stock should be made. All the sales of common stock here in issue, as well as other sales not in issue, were made pursuant to the agreement between corporation and all the common stockholders, all of whom were actively engaged in the business. Under that agreement a method was provided for determining annually, in accordance with a consolidated balance sheet adjusted so as to reflect the true net worth of the consolidated business enterprise, a price at which transfers of the common stock should be made. The holders of 75 per cent of the common stock could direct any party to sell all or any part of his stock to corporation or to such person as they might designate. No party could sell or otherwise dispose of his common stock without the written consent of 75 per cent of the holders. If any party should elect to withdraw from the business, he had to sell his stock to corporation. If any party should die, his stock was to be purchased by corporation. No cash dividend could be paid on common stock so long as corporation was indebted in any sum whatever. Other provisions of the agreement are set out in our findings and need not be repeated here. It was contemplated not only that Clayton and Anderson would sell some of their common stock from time to time to their juniors, but also that as the latter should pass the peak of responsibility, they in turn would sell part of their holdings to their juniors who were taking on more responsibility. In other words, the common stock was designed not to be marketable, but to be held in direct proportion to the active participation of each stockholder in the business enterprise.

It is obvious from all these circumstances that the sales of common stock were motivated by the peculiar importance of expert and continuous management to the cotton merchandising business. They were intended to preserve or augment the value of the estates of Clayton and Anderson, as well as to relieve them of obligations to corporation. All the vendees of the stock were, either at the time of the sales or shortly thereafter, managing executives in association and held qualifying shares to make them fully liable for the debts of association. Association being a modified form of partnership, the vendees were partners with Anderson and Clayton in the operating entity of the business enterprise. There was no intent on the part of Anderson and Clayton in selling the stock to confer, nor intent on the part of

their vendees to receive, gratuitous benefits. Clearly, then, these transactions were not gifts in any ordinary sense of the word.

In contending that the sales of stock were not "made in the ordinary course of business," respondent's position appears to be that it was neither ordinary for Anderson and Clayton nor ordinary for business men in general to enter into transactions of the type here, involved. We do not agree. On the contrary, it is apparent from the numerous occasions on which Clayton and Anderson sold common stock to their junior executives, both those in issue and others not in issue, that it was a quite customary and ordinary thing for them to do. The record also proves that profit sharing or participation among the active management was quite the ordinary and customary practice in the cotton merchandising business generally. Furthermore, from facts within the range of judicial knowledge, we know that nothing is more ordinary, as business is conducted in this country, than profit-sharing arrangements and plans for the acquisition of proprietary interests by junior executives or junior partners, often for inadequate consideration, if consideration is to be measured solely in terms of money or something reducible to a money value.

The cases of *Deputy* v. *DuPont*, 308 U. S. 488, and *Welch* v. *Helvering*, 290 U. S. 111, relied on by respondent, have little if any bearing on the problem here presented. Both cases deal with expense deductions for income tax purposes under a statute providing for the allowance of "ordinary and necessary expenses paid or incurred * * * *in carrying on any trade or business.*" (Italics supplied.) It does not follow that considerations which are relevant in determining whether an item of expense is an "ordinary and necessary" business expense for purposes of income tax deduction are relevant in determining whether a transfer of property is made "in the ordinary course of business" for purposes of the gift tax.

The pertinent inquiry for gift tax purposes is whether the transaction is a *genuine business* transaction, as distinguished, for example, from the marital or family type of transaction involved in *Wemyss* and its companion case, *Merrill* v. *Fahs*, 324 U. S. 308. Surely it will not be said that there may not be a genuine business transaction not directly connected with the taxpayer's trade or business or even though the taxpayer be not engaged in "carrying on any trade or business," within the scope of that term as limited by *Higgins* v. *Commissioner*, 312 U. S. 212. Bad bargains, sales for less than market, sales for less than adequate consideration in money or money's worth are made every day in the business world, for one reason or another; but no one would think for a moment that any gift is involved, even in the broadest possible sense of the term "gift."

It appears that this is the first attempt on the part of the respondent to apply the gift **tax to** transactions such as those presented here.

To sustain the attempt, in our judgment, would be to work a perversion of the whole purpose and spirit of the gift tax law. However broadly Congress may have used the term "gifts" in the gift tax law, and however much it may have dispensed with common law concepts of gifts, we are certain that that law was neither designed nor intended in its operation to hamper or strait-jacket the ordinary conduct of business.

We have found that the sales of stock in issue were bona fide and made at arm's length, in the ordinary course of business. Therefore, assuming, without deciding, that the value of the stock was greater than the value of the consideration, we hold that the transfers are not subject to gift tax. This makes it unnecessary to decide the question of value or to determine in which calendar years certain of the transfers were effected, and we have accordingly made no findings of fact with respect to these questions.

Reviewed by the Court.

*Decisions will be entered for the petitioners.*