ESTATE OF EDWARD E. DICKINSON, JR., DECEASED, ALEXANDER NESTOR, CO-EXECUTOR, AND DOROTHY E. DICKINSON, CO-EXECUTOR, PETITIONERS v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3075–73.    Filed March 31, 1975.

*Charles B. Milliken* and *Alex Lloyd,* for the petitioners.
*Peter J. Panuthos,* for the respondent.

## OPINION

SIMPSON, *Judge:* The Commissioner determined a deficiency of $6,042,836.13 in the petitioner's estate tax. Due to concessions, the only issue remaining for consideration is whether certain charitable and marital gifts are to be charged with Federal estate and State death taxes. The resolution of that question turns on whether to give effect to an agreement providing that a "buy-sell" agreement should be set aside if the Commissioner disregards the purchase price in the "buy-sell" agreement for purposes of valuing the estate.

All of the facts have been stipulated, and those facts are so found.

The petitioner is the Estate of Edward E. Dickinson, Jr., who died November 22, 1968. The executors of the estate were his wife, Dorothy E. Dickinson, and Alexander Nestor, whose address was in Bridgeport, Conn., at the time of filing the petition herein. They were qualified as executors of the estate under letters testamentary granted by the Probate Court for the District of Essex, Conn. (the Probate Court). The estate's Federal estate tax return was filed with the North Atlantic

Service Center of the Internal Revenue Service, Andover, Mass., and was received there on February 20, 1970. The estate elected to be valued as of the alternate valuation date or dates. Mr. Dickinson's two sons, E. E. Dickinson III and Alan Page Dickinson, and his two daughters, Alice Dickinson Wright and Patricia Dickinson Simmons, also survived Mr. Dickinson.

Mr. Dickinson's will, executed May 26, 1965, was duly admitted to probate in the Probate Court. The tax clause directed, in part, as follows:

I direct my Executors * * * to pay all my just debts * * * and funeral expenses and all the expenses of settlement of my estate, including ancillary administration, if any, and to pay as an administration expense all inheritance, succession and transfer taxes in this or any other state or of the United States, or any foreign country, imposed upon my estate, or any interest passing under this will, or by taxable transfers, if any, so that the same shall pass free from any such tax and I direct that there shall be no proration of any tax so paid among the persons interested in the estate to whom property of my estate is or may be transferred or to whom any benefit accrues. * * *

The will also provided that Mrs. Dickinson was to receive various items of Mr. Dickinson's property and that she was to be given in trust:

a portion of my estate, which portion shall be equal in value to one-half (½) of the value of my adjusted gross estate, as that expression is defined in Chapter 11 of the Internal Revenue Code of 1954, less, however, the value of * * * [other] gifts to my said wife under the provisions of * * * [this will], and less the value of any other property required to be included in said adjusted gross estate which passes or has pass [sic] to her otherwise than by virtue of the provisions of this my will and which qualifies for the marital deduction as in said Code defined * * *

It was also stated that:

I intend that the value of the property in this marital trust shall be available for the marital deduction allowed by the Federal Estate Tax Law applicable to my estate; and all questions (including questions of construction) applicable to my will, to my estate and to the marital trust shall be resolved accordingly. To this end, the powers and discretions of my Executors shall not be exercised or exercisable except in a manner consistent with my intention as expressed in the preceding sentence.

In addition, the will made certain gifts to various charitable institutions. Several other dispositions were made in the will, and the residue of the estate was transferred to various trusts which were primarily for the benefit of Mr. Dickinson's children and grandchildren.

From June 29, 1961, up to and including November 22, 1969, the estate's alternate valuation date, there were issued and outstanding 9,000 shares of common stock and 2,666 shares of $100 par preferred stock of the E. E. Dickinson Co. (the company), which were held as follows:

| Common shares | | Preferred shares | |
|---|---|---|---|
| Edward E. Dickinson, Jr. __ | 8,795 | In trust for the benefit of | |
| Dorothy E. Dickinson ____ | 1 | Dorothy E. Dickinson___ | 2,666 |
| E. E. Dickinson III_____ | 102 | | |
| Alan Page Dickinson _____ | 102 | | |

On June 29, 1961, Mr. Dickinson and the company entered into an agreement (the 1961 agreement), which was duly authorized by the shareholders and board of directors of the company and duly executed by the company. In part, the 1961 agreement provided as follows:

1. (a) Dickinson for himself, his heirs, executors and administrators agrees that his estate shall sell to the Company and the Company agrees that it will purchase from said estate a number of shares of the Company's stock which shall be the lesser of the following two numbers of shares: either (i) 8795 shares of the Company's stock owned by Dickinson at the date of this agreement, or (ii) the number of shares whose total price computed in accordance with paragraph 3 below shall have a total equal to the sum of the estate, inheritance and succession taxes (including any interest collected as part of such taxes) imposed because of the death of Dickinson.

\* \* \*

2. Dickinson agrees that during his lifetime he will not, by sale or other disposition, reduce the number of shares of the Company's stock held by him below 8795 shares.

3. The price per share to be paid by the Company for the shares which it is obligated to purchase from Dickinson's estate shall be the sum of the following items taken from the Company's balance sheet—(a) Reserve for Replacement and Advertising, (b) Employees' Pension and Contingency Reserve, (c) Common Stock, (d) Capital Surplus, (e) Earned Surplus—divided by the number of shares of stock of the Company outstanding at the date of said balance sheet. The balance sheet to be used in computing the price per share, in accordance with this paragraph 3, shall be that set forth in the Company's Federal Corporation Income Tax Return (Treasury Form 1120, Schedule L or such equivalent schedule as may hereafter be required by law) for the end of the taxable period ending next prior to the death of Dickinson.

The parties have agreed that the price per share computed in accordance with the formula contained in paragraph 3 is

$188.4482, and we shall refer to it as the formula price.[1]

Subsequent to the execution of the 1961 agreement, Mr. Dickinson requested his attorney to study the effect such agreement would have on his estate's Federal estate taxes. In response, his attorney, on April 16, 1962, advised him that the Internal Revenue Service might not accept the formula price as the value of the stock for estate tax purposes. The attorney pointed out to him that if the 1961 agreement were retained, it might have the effect of fixing the price that could be realized on a sale of the stock to the company, even though the value of the estate subjected to taxation would be based on a higher fair market value. Mr. Dickinson was advised that his objectives might better be accomplished by providing for the company to purchase his stock at its fair market value.

On April 27, 1962, Mr. Dickinson, Mrs. Dickinson, E. E. Dickinson III, and Alan Page Dickinson entered into an agreement (the 1962 agreement). In part, such agreement provided that:

WHEREAS, * * * [Mr. Dickinson] is irrevocably bound by an Agreement between him and * * * [the company] dated June 29th, 1961, so that his executors will be required to sell to the Company a number of shares of stock in the Company as provided in paragraph 1 (a) of * * * [the 1961] Agreement at a specified price as provided in paragraph 3 of * * * [the 1961] Agreement, and * * * [Mr. Dickinson] is precluded by * * * [the 1961] Agreement from selling such shares to others during his lifetime; and
      * * *

WHEREAS, * * * [Mrs. Dickinson, E. E. Dickinson III, and Alan Page Dickinson] hold all of the common stock in the Company not held by * * * [Mr. Dickinson] and desire that * * * [the 1961] Agreement remain in full force and effect;

### NOW THEREFORE:

In consideration of the foregoing and of the sum of One (1) Dollar and other good and valuable considerations, the parties hereto do hereby agree as follows:

1. (a) In the event that the Internal Revenue Service should take an action which would disregard for estate tax valuation purposes the price for said shares as provided in paragraph 3 of * * * [the 1961] Agreement or take an action which would in effect deny the benefits of Section 303 and thereby be contradictory to the intentions of Congress in enacting this section governing the redemption of stock to pay death taxes, the personal representatives of * * * [Mr. Dickinson] may, if they in their sole discretion deem such action by the

---

[1] We recognize that such price is based on the balance sheet at the end of 1968, not that at the end of 1967, but for sake of convenience, we shall follow the agreement of the parties.

Internal Revenue Service to threaten a damaging result either to the estate, heirs, devisees and legatees of * * * [Mr. Dickinson], or to the remaining stockholders of the Company, request to be relieved of the estate's obligation to sell said stock pursuant to * * * [the 1961] agreement, and * * * [Mrs. Dickinson, E. E. Dickinson III, and Alan Page Dickinson] agree for themselves, their heirs, executors, administrators and assigns, that upon receipt of such request they will whether acting as stockholders and/or directors of the Company cause the Company to release the estate of * * * [Mr. Dickinson] from such obligations as it may have under * * * [the 1961] Agreement.

On the estate's Federal estate tax return, the value of the company's shares was based on the formula price, resulting in a total value of $1,657,401.92. In his notice of deficiency, the Commissioner took the position that the formula price did not represent the value of the stock and that, on the alternate valuation date, the fair market value of such stock was $600 per share, resulting in a total value of $5,277,000. The estate now accepts the Commissioner's valuation of the stock.

In accordance with the provisions of the 1962 agreement, on April 8, 1974, Mrs. Dickinson and Mr. Nestor, as executors of the estate, requested the shareholders and the directors of the company to relieve the executors of their obligation to sell the company's shares to the company pursuant to the 1961 agreement. On April 8 and 9, 1974, the directors of the company were Mrs. Dickinson, E. E. Dickinson III, and Alexander Nestor; the shareholders were the same as they had been in 1969, except that Mr. Dickinson's shares and Alan Page Dickinson's shares were held by their respective executors. On those days, the company's shareholders and directors consented to the executors' request and caused the company to release the executors from their obligations under the 1961 agreement. As of April 16, 1974, none of the estate's shares had been redeemed or purchased by the company.

According to the Commissioner's position, although the value of the estate is based on the fair market value of the company's stock, the 1961 agreement is in force, and it fixes the amount which the estate may realize on the sale of the stock and distribute under the will. He argues that the 1962 agreement is void because it is contrary to public policy and because it would vary the value of interests passing at death by reason of circumstances occurring subsequently. According to his position, the residue of the estate is insufficient to pay the Federal estate and State death taxes, and the excess of such taxes is allocable among

the other interests passing under the will, including the marital and charitable gifts.

The parties agree that the residue should first be applied to pay Federal estate and State death taxes. We agree with the petitioner that the 1962 agreement should be recognized for purposes of administering the estate, with the result that the formula price has no effect in administering the estate and the residue is sufficient to pay the Federal estate and State death taxes. Having adopted that conclusion, we need not deal with the petitioner's alternative argument concerning the allocation of the burden of the taxes when the residue is insufficient to pay them.

There is no doubt about what Mr. Dickinson wished to happen and about what has in fact taken place. After having made the 1961 agreement, apparently he became concerned about its tax consequences and sought the advice of his counsel. The counsel advised him that the "buy-sell" agreement might not be effective for purposes of determining the value of the stock subjected to taxation. He was also advised that if the 1961 agreement were not modified, the estate might encounter the very situation which now exists—namely, the Commissioner would take the position that the fair market value of the stock should be used for valuation purposes, but that the agreement should be applied for purposes of administering the estate. To avoid such paradoxical results, Mr. Dickinson and his family made the 1962 agreement, which was designed to enable his family to set aside the 1961 agreement for all purposes, if the Commissioner sought to set it aside for valuation purposes. Since the Commissioner has adopted the anticipated position as to the valuation of the stock, the family has carried out Mr. Dickinson's wishes and set the 1961 agreement aside for all purposes. Thus, we have a situation in which the "buy-sell" agreement has been duly set aside, and it should have no effect in administering the estate, unless we hold that it is to be given effect notwithstanding the efforts to terminate it.

In our judgment, there are no reasons for refusing to give effect to the 1962 agreement and the actions taken pursuant thereto. See *Estate of Arthur H. Hull,* 38 T.C. 512 (1962), reversed on another issue 325 F. 2d 367 (C.A. 3, 1963); *Estate of Mary Redding Shedd,* 37 T.C. 394 (1961), affd. 320 F. 2d 638 (C.A. 9, 1963); cf. *Welch v. Hall,* 134 F. 2d 366 (C.A. 1, 1943); compare *William H. Board,* 14 T.C. 322 (1950). The Commissioner relies

upon *Commissioner v. Procter*, 142 F. 2d 824 (C.A. 4, 1944), reversing and remanding a Memorandum Opinion of this Court, certiorari denied 323 U.S. 756 (1944), in which the grantor of a trust provided that if one of the gifts was held by a court to be subject to the gift tax, the gift was to be revoked. The court held that such a clause was void because it would tend to discourage administrative action and would cause a judicial decision to become a mere nullity. However, the rationale of *Procter* is not applicable to the facts of the case before us. In this case, the Commissioner has taken the position that the 1961 agreement should be disregarded for purposes of fixing the value of the stock subjected to taxation, and the estate has accepted that position. The 1962 agreement makes no attempt to nullify that determination; its only objective is to establish consistency in the administration of the estate. Mr. Dickinson recognized that if the stock was to be taxed on the basis of its fair market value, his estate plan would be distorted if the formula price was used for other purposes, and the only purpose of the 1962 agreement was to avoid such a distortion of his plan. That agreement was a reasonable and appropriate means of anticipating possible future adverse action by the Commissioner and avoiding its consequences. Such agreement is similar to those provisions which we have recognized in *Surface Combustion Corp.*, 9 T.C. 631 (1947), affd. 181 F. 2d 444 (C.A. 6, 1950), and *William D. O'Brien*, 46 T.C. 583 (1966).

Nor are we convinced by the Commissioner's other objection to the 1962 agreement. Both parties agree that the 1961 and 1962 agreements have no effect on the value of the stock to be included in the estate. Once the 1962 agreement was made, there was no serious uncertainty about what would ultimately take place. One could be assured that the Commissioner would not accept the formula price for purposes of valuing the stock (section 20.2031–2(h), Estate Tax Regs.), and once he takes that action, it would set in motion proceedings under the 1962 agreement to set aside the 1961 agreement for all purposes. Thus, there was no genuine difficulty in determining the value of the interests that would pass under the will. Cf. *Estate of Inez G. Coleman*, 52 T.C. 921 (1969). Accordingly, we hold that the parties to the 1962 agreement have effectively terminated any obligations under the 1961 agreement and that the formula price has no effect in

determining the amount of the estate which passes under the will and the value of the interests passing thereunder.

*Decision will be entered under Rule 155.*