VIRGINIA Z. HARWOOD, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 6557–81—6561–81.     Filed February 8, 1984.

---

[1]Cases of the following petitioners are consolidated herewith: Belva Y. Harwood, docket No. 6558–81; Morris J. Harwood, docket No. 6559–81; Margaret P. Harwood, docket No. 6560–81; and Arthur H. Harwood, docket No. 6561–81.

240

*Edward B. Simpson* and *John S. Convery*, for the petitioners. *Neal O. Abreu* and *David L. Denier*, for the respondent.

FORRESTER, *Judge*: Respondent determined deficiencies in gift taxes for the petitioners in these cases as follows:

| Docket No. | Petitioner | For calendar quarters ended: | Deficiency |
|---|---|---|---|
| 6557–81 | Virginia Z. Harwood | 3/31/73 | $40,787 |
|  |  | 12/31/76 | 209,786 |
| 6558–81 | Belva Y. Harwood | 3/31/73 | 580,640 |
| 6559–81 | Morris J. Harwood | 3/31/73 | 91,888 |
|  |  | 12/31/76 | 221,848 |
|  |  | 12/31/78 | 12,420 |
|  |  | 12/31/79 | 16,210 |
| 6560–81 | Margaret P. Harwood | 12/31/76 | 189,558 |
| 6561–81 | Arthur H. Harwood | 3/31/73 | 40,787 |
|  |  | 12/31/76 | 209,786 |

After concessions, the issues for our decision are:

(1) Whether Belva Harwood made a gift in 1973 to her sons, Arthur H. and Morris J. Harwood, of a minority partnership interest in Harwood Investment partnership;

(2) Whether Arthur and Virginia Harwood and Morris J. Harwood gave in 1973 a minority partnership interest in Harwood Investment partnership to Mary Suzanne Harwood Rubattino;

(3) Whether restrictive provisions contained in partnership agreements of Harwood Investment Co. on January 1, 1973, and December 29, 1976, are binding upon respondent in determining the fair market value of the interests in Harwood Investment Co. for gift tax purposes;

(4) What is the fair market value of the limited partnership interests in Harwood Investment Co. given to the Arthur H. and Morris J. Harwood Family Trusts on December 29, 1976;

(5) What are the fair market values of the minority partnership interests in Harwood Investment Co. transferred on January 1, 1973, by Belva Harwood, Arthur H. and Virginia Harwood, and Morris J. Harwood;

(6) Whether the savings clauses in the Arthur H. Harwood 1976 Family Trust and in the Morris J. Harwood 1976 Family Trust limiting the amount of the gifts made by the respective grantors in the event of IRS challenge are enforceable so as to avoid gift tax on completed gifts of interests in Harwood Investment Co. to the two trusts.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

When the petitions in these cases were filed, Virginia Z. Harwood (hereinafter Virginia) and Arthur H. Harwood (hereinafter Bud) resided in Branscomb, Calif.; Belva Y. Harwood (hereinafter Belva) resided in Santa Rosa, Calif.; and Morris J. Harwood (hereinafter Jack) and Margaret P. Harwood (hereinafter Margaret) resided in Willits, Calif. Virginia was married to Bud during the years at issue, and Margaret was married to Jack during the years at issue. Belva is the mother of Jack and Bud, and of Mary Suzanne Harwood Rubattino (hereinafter Suzanne).

In 1953, Arthur Harwood, Sr. (hereinafter Arthur), the father of Bud, Jack, and Suzanne, started a small sawmill in Branscomb, Calif. In 1955, the sawmill was operated as a partnership under the trade name "Branscomb Enterprises," with Arthur, Bud, and Jack, general partners, and Jack, as trustee for Suzanne, a limited partner. Branscomb Enterprises' business was the operation of the sawmill, which converted logs to lumber and other milled forest products.

On January 1, 1955, Arthur, Bud, and Jack formed Harwood Investment Co. (hereinafter HIC), a partnership. Each held a one-third general partnership interest in HIC. The partnership interest in Arthur's name was the community property of Arthur and Belva.

The partnership agreement included the following clause:

ELEVENTH: DISSOLUTION AND LIQUIDATION. If during the existence of the partnership a partner shall die or be declared incompetent, the remaining partners agree, subject to the provisions of this paragraph ELEVENTH, to continue the business of the partnership until the end of the year in which such event or events shall occur, and such death or incompetence shall not immediately dissolve the partnership, and the continuing partnership shall be the same partnership for all purposes until the end of said year. It is the intention of the parties that the partnership shall continue through the then current year, and that no decrease in the personnel thereof shall effect a dissolution of the partnership until the end of said year unless the partnership shall be terminated as hereinbelow specifically provided.

Each partner agrees for himself and hereby obligates his heirs, executors, administrators and assigns to permit the partnership to use (subject to the terms of this agreement) his contribution in or to the business for the uses herein specified, until the dissolution of the partnership.

In the event of death or incompetence of a partner, the remaining partners may elect at their option at the end of the year in which such event or events occur to form a successor partnership and to continue the partnership business, in which event full payment shall be made in cash by the said successor partnership within one year for the amount of the book value of the interest of such deceased or incompetent partner. "Book value" for this purpose includes the partner's capital contribution, his loans (if any) to the partnership, and his share in any unwithdrawn partnership profits, adjusted for his share in any undivided partnership loss, all as set forth in the duly audited partnership balance sheet at the end of the year in question. In the determination of said book value no allowance shall be made or included for "good will" or unrealized appreciation of partnership property or actual depreciation in excess of depreciation recorded in the partnership books of account.

If any partner shall withdraw or be adjudicated a bankrupt during the existence of the partnership, the remaining partners shall have the same rights and duties as if the withdrawing or bankrupt partner had died upon such date, except that any successor partnership may, at its election, pay the book value of the interest of the said withdrawing or bankrupt partner in four equal annual installments, without interest, the first such installment to be due on the ninetieth (90th) day after the end of the year in which such event shall occur.

\*      \*      \*      \*      \*      \*      \*

Notwithstanding any other provision of this agreement, it is expressly agreed that in the event of the death, incompetence, withdrawal or bankruptcy of ARTHUR P. HARWOOD, BELVA HARWOOD, his wife, may at her option acquire the said ARTHUR HARWOOD'S interest upon terms no less favorable to her than the terms set forth herein, and thereafter the said BELVA HARWOOD shall be an equal partner in this partnership. To exercise this option the said BELVA HARWOOD shall give written notice to the other partners at the principal place of business of the partnership

within ninety (90) days after the death, withdrawal, or adjudication of bankruptcy or incompetence of the said ARTHUR HARWOOD.

HIC acquires and holds timberland, timber rights, and other properties.

On or about July 1955, Harwood Logging Co., a corporation, was formed by Arthur, Bud, and Jack, each holding a one-third interest. Harwood Logging Co. purchases timber acquired and held by HIC and cuts it into logs.

Sometime in the early 1970's, Branscomb Enterprises changed its name to Harwood Products Co., a limited partnership. Harwood Products Co. continued to purchase logs and operate the sawmill which converts the logs to lumber and other milled forest products.

On July 16, 1955, Arthur executed his last will and testament. Belva concurrently executed a document which was attached to the will. In the third paragraph of his will, Arthur Harwood, Sr., directed that his entire separate estate and all the community property, including his wife's share therein, was to pass to a testamentary trust. In a document attached to the will, Belva consented in writing to the provisions of the aforementioned will whereby Arthur disposed of all of their community property. Arthur provided in the sixth paragraph of his will that should his wife revoke the aforementioned consent and elect to take her statutory share in lieu of the provisions made for her in the will, then the will was to be given effect as if Belva had predeceased Arthur, except as to certain bequests made to her in the second paragraph of the will.

On March 8, 1958, Arthur Harwood, Sr., died from a stroke. He was survived by Belva and their three children, Bud, Jack, and Suzanne. Arthur's will was admitted to probate in the Superior Court of the State of California for the county of Mendocino.

In 1971, Belva withdrew her consent to dispose of her share of community property by her husband's will. Pursuant to a December 3, 1971, order of the Superior Court of the State of California for the county of Mendocino, Belva received a one-half interest in the community property held in trust. Since Arthur was a one-third partner in HIC at the time of his death, Belva received a one-sixth interest pursuant to the 1971 court order.

Upon Belva's election to take against the will, and pursuant to the provisions of the will, the remaining one-sixth interest in HIC was divided into equal shares for Bud, Jack, and Suzanne as follows:

Bud ............... 1/3 of 1/6 interest (or 1/18 interest)
Jack............... 1/3 of 1/6 interest (or 1/18 interest)
Suzanne........... 1/3 of 1/6 interest (or 1/18 interest) (held in trust until she reached the age of 35 which occurred September 1, 1976.)

On January 1, 1973, Belva transferred her one-sixth interest in HIC to her two sons, Bud and Jack, in equal shares, in exchange for a promissory note in the amount of $573,365 to be paid in four equal annual installments without interest. Subsequently, Belva exchanged the promissory note for a lifetime annuity from Bud and Jack.

On January 1, 1973, an additional one-eighteenth interest in HIC was transferred to Suzanne.

Upon acquisition by Bud and Jack of Belva's one-sixth interest on January 1, 1973, and upon the transfer to Suzanne of one-eighteenth interest on said date, the partnership interests in HIC were as follows:

| Partner | Partnership interest |
|---|---|
| Bud | 4/9 |
| Jack | 4/9 |
| Suzanne | 1/9 |

The transfer of this additional one-eighteenth interest to Suzanne was due to her desire to increase her participation in HIC, and Bud and Jack's acquiescence to her desire. John Convery (hereinafter Convery), a C.P.A. and attorney employed by the Harwood family for many years, handled the details of the transaction. The books and records of HIC after January 1, 1973, reflect a one-ninth interest held by Suzanne. No money was transferred by Suzanne to HIC in 1973, nor was there any written agreement that Suzanne would pay any amount for the above one-eighteenth interest in HIC which was acquired on January 1, 1973.

On October 19, 1978, Suzanne paid $300,000 to HIC, which was credited to her drawing account. This $300,000 payment occurred after an IRS agent pointed out to Convery that

Suzanne had paid no money in exchange for the interest in HIC that she acquired on January 1, 1973.

On January 1, 1973, a new partnership agreement for Harwood Investment was executed, which provides in pertinent part:

ARTICLES OF COPARTNERSHIP
OF HARWOOD INVESTMENT CO.

This Agreement of Partnership made and entered into this 1st day of Jan., 1973, by and among ARTHUR H. HARWOOD, MORRIS JACKSON HARWOOD and SUZANNE HARWOOD RUBATTINO, who mutually associate themselves together as partners, and do hereby form and constitute themselves a partnership under the laws of the State of California for the purpose of investing in, acquiring and operating farm lands and other real properties, including participation in joint ventures for similar or related purposes, and for the further purpose of conducting any lawful business activity, in the County of Mendocino and elsewhere, from and after the date hereof until terminated as set forth hereinafter or otherwise.

FIRST: *Location of Business.* The principal place of business shall be in Branscomb, County of Mendocino, State of California.

SECOND: *Capital.* The partnership capital shall consist of cash and other assets as set forth in Exhibit A.

THIRD: *Managing Partners.* Arthur H. Harwood and Morris J. Harwood are hereby appointed managing partners. During the existence of this partnership the managing partners shall have ultimate authority to make and execute such decisions as they shall deem advisable with respect to the business operations for which this partnership has been organized. In the event of the death of either managing partner, the survivor shall act as managing partner.

\*      \*      \*      \*      \*      \*      \*

FIFTH: *Profits.* As soon as practicable after the end of each calendar year, the net profits from the partnership for such calendar year shall be determined. Net profits shall be deemed to be the result after deducting from gross profits all expenses incident to the conduct of the business, interest on moneys borrowed, salaries to partners, all losses, and such other charges, expenses and deductions against gross profits as are properly chargeable hereunder or in accordance with good accounting practice. The remaining net profits, if any there be, shall be divided equally among the partners as follows:

Arthur H. Harwood – 4/9ths
Morris J. Harwood – 4/9ths
Suzanne Harwood Rubattino – 1/9th

SIXTH: *Losses and Liabilities*. If the partnership shall suffer a net loss for any year, such loss shall be charged against the capital accounts of the partners in the same proportion as set forth for profits in Paragraph FIFTH above.

      \*         \*         \*         \*         \*         \*         \*

EIGHTH: *Partnership Books*. The partners shall keep or cause to be kept full and accurate books of account for the partnership business, all of which books shall at all times be open to the inspection and examination of each of the partners. Such books shall be examined by a reputable public accountant at least once a year so that the net profits or losses made by the partnership shall be ascertained, apportioned, and credited to or charged against the respective partners.

NINTH: *Duties of Partners*. (a) No partner shall make, draw, endorse, accept, sign or execute any promissory note, draft, bill of exchange, bond, obligation, commercial paper or other material obligation, or become surety in any way or form whatsoever, in his own name or in the name of the partnership for the accommodation of any firm, person or corporation.

(b) No partner shall engage or be interested in any business which gives him an interest adverse to the partnership.

(c) Each partner shall devote his time, energy and skill to the best of his ability for the interest, profit, benefit and advantage of the partnership.

TENTH: *Dissolution and Liquidation*. If during the existence of the partnership a partner shall die or be declared incompetent, the remaining partners agree, subject to the provisions of this Paragraph TENTH, to continue the business of the partnership until the end of the quarter during which said partner becomes incompetent or dies, and the continuing partnership shall be the same partnership for all purposes until the end of said quarter. The quarters are measured on the calendar year, i.e., March 31, June 30, September 30 and December 31. It is the intention of the parties that the partnership shall continue through the then current quarter and that no decrease in the personnel thereof shall effect a dissolution of the partnership until the end of said quarter unless the partnership shall be terminated as hereinafter specifically provided.

Each partner agrees for himself and hereby obligates his heirs, executors, administrators and assigns to permit the partnership to use (subject to the terms of this agreement) his contribution in or to the business for the uses herein specified, until the dissolution of the partnership.

In the event of death or incompetence of a partner, the remaining partners may elect at their option at the end of a quarter in which such event or events occur to form a successor partnership and to continue the partnership business, in which event full payment shall be made in cash or in the form of a promissory note by the said successor partnership within one year for the amount of the book value of the interest of such deceased or incompetent partner. "Book value" for this purpose includes the partner's capital contribution, his loans (if any) to the partnership, and his share of any unwithdrawn partnership profits, adjusted for his share in any undivided partnership loss, all as set forth in the duly audited partnership balance

sheet at the end of the quarter in question. In the determination of said book value no allowance shall be made or included for "good will" or unrealized appreciation of partnership property or actual depreciation in excess of depreciation recorded in the partnership books of account.

If any partner shall withdraw or be adjudicated a bankrupt during the existence of the partnership, the remaining partners shall have the same rights and duties as if the withdrawing or bankrupt partner had died upon such date, except that any successor partnership may, at its election, pay the book value of the interest of the said withdrawing or bankrupt partner in four equal annual installments, without interest, the first such installment to be due on the ninetieth (90th) day after the end of the year in which such event shall occur. Said payments may be in the form of cash or interest-bearing promissory notes.

The partnership may be dissolved at any time by a majority in interest of all partners, in which event they shall give written notice to the other partner of their election to dissolve by addressing the same to said partner at his last known address according to the partnership records, and depositing the same in the United States mail, postage prepaid. The notice shall specify the date fixed for the dissolution of the partnership, and, upon such date, the partnership shall be dissolved and liquidated in the manner provided hereinafter.

In the event of dissolution of the partnership and complete liquidation of all of the partnership assets, all of the partners shall share equally in the profits and losses realized in the liquidation process in the same proportion as they share in profits and losses as set forth in Paragraphs FIFTH and SIXTH hereinabove.

Upon complete liquidation of the partnership assets, funds thus realized shall be first applied to pay partnership debts, and any excess shall be distributed among the partners in accordance with their respective entitlements. In the event that installment distributions are made, no partner shall receive any installment distribution large enough to reduce his investment in the partnership below an amount at least equal to his share of any possible loss, and a sufficient reserve to meet probable expenses shall be maintained at all times.

ELEVENTH: *Arbitration.* All partners agree that they will do their utmost in all circumstances and conditions to make an amicable adjustment of any dispute or controversy which may arise among them during the continuance of this partnership, and in accounting or settlements to be made on liquidation, and that no one of them will in any circumstances bring any action, either at law or in equity, for the dissolution of this partnership or for any other legal or equitable relief. If at any time a dispute arises involving the accounts, the issues shall be submitted for settlement to such public accountant as may be mutually agreed upon, and if a dispute arises as to other matters, the issues shall be submitted for settlement to such public accountant and to such attorney as may be mutually agreed upon, with power lodged in them to select a third party in case of a disagreement, and the partners agree that the decision of any such arbitration shall be binding upon each of them.

On December 29, 1976, Bud and Virginia created a trust entitled "The Arthur H. Harwood 1976 Family Trust" for the benefit of their four children, with the Bank of America NT & SA acting as the trustee. As of December 29, 1976, Bud's four-ninths interest in HIC was the community property of Arthur H. Harwood and Virginia Z. Harwood.

On December 29, 1976, Jack and Margaret created a trust entitled "The Morris J. Harwood 1976 Family Trust" for the benefit of their four children with Bank of America NT & SA acting as trustee. For all times material hereto, Morris J. Harwood's four-ninths interest in HIC was his separate property.

Each of the aforementioned trust agreements contained the following clause:

Article FIRST. Property subject to this instrument listed in Schedule "A" is referred to as the "trust estate" and shall be held, administered, and distributed in accordance with this instrument. In the event that the value of the partnership interest listed in Schedule "A" shall be *finally determined* to exceed $400,000 for purposes of computing the California or United States Gift Tax, and in the opinion of the Attorney for the trustee a lower value is not reasonably defendable, the trustee shall immediately execute a promissory note to the trustors in the usual form at 6 percent interest in a principal amount equal to the difference between the value of such gift and $400,000. The note shall carry interest and be effective as of the day of the gift. [Emphasis supplied.]

Also on December 29, 1976, Harwood Investment Co., a limited partnership, was duly formed and certificate recorded, to succeed Harwood Investment Co., a general partnership. Bud and Jack were the general partners for stated percentage interests, and they also were limited partners for stated percentage interests. Bank of America NT & SA, trustee of the Arthur H. Harwood 1976 Family Trust, Bank of America NT & SA, trustee of the Morris J. Harwood 1976 Family Trust, and Suzanne were limited partners, each for stated percentage interests. The partnership agreement provided in pertinent part:

### LIMITED PARTNERSHIP AGREEMENT

ARTHUR H. HARWOOD and MORRIS J. HARWOOD of Mendocino County herein called General Partners and Bank of America NT & SA trustee of the Arthur H. Harwood 1976 Family Trust and Bank of America

NT & SA trustee of the Morris J. Harwood 1976 Family Trust and Suzanne Harwood Rubattino, herein called Limited Partners agree that:

## ARTICLE I.
### NATURE OF PARTNERSHIP

1.01 They hereby form a Limited Partnership, herein called "The Partnership," pursuant to the provisions of Chapter 2, Title 2 of the Corporations Code of the State of California, known as the "Uniform Limited Partnership Act" of California.

1.02 The name of the partnership shall be Harwood Investment Company.

1.03 The Partnership shall engage in the business of investing in, acquiring and operating farm lands and other real properties, including participation in joint ventures for similar or related purposes, and for the further purposes of conducting any lawful business activity.

1.04 The principal place of business of the Partnership shall be at Branscomb, Mendocino County, California, or at such other place or places within Mendocino County, California as may be determined by the General Partners by the giving of written notice of change of address of the principal place of business of the Partnership to each Limited Partner at least 30 days before such change.

1.05 The Partnership shall commence on the recording of a Certificate of Limited Partnership in the manner required by the Uniform Limited Partnership Act and shall continue until terminated as herein provided.

## ARTICLE II.
### MEMBERS OF PARTNERSHIP

### *Original General Partners*

2.01 The name and place of residence of each original General Partner is as follows:

| Name | Address |
|---|---|
| Arthur H. Harwood | Branscomb, California |
| Morris J. Harwood | 26800 Sherwood Road Willits, California |

### *Original Limited Partners*

2.02 The name and place of residence of each original Limited Partner is as follows:

| Name | Address |
|---|---|
| Arthur H. Harwood | Branscomb, California |
| Morris J. Harwood | 26800 Sherwood Road Willits, California |

| *Name* | *Address* |
|---|---|
| Suzanne Harwood Rubattino | 1060 Wikiup Drive<br>Santa Rosa, California |
| Bank of America, Trustee | 10 Santa Rosa Avenue<br>Santa Rosa, California |
| Bank of America, Trustee | 10 Santa Rosa Avenue<br>Santa Rosa, California |

2.03 Subject to any other provision of this Agreement, after the formation of the Partnership a person may be admitted as a General Partner with the written consent of all the General Partners and all the Limited Partners, on the recording of an amendment to the original Certificate of Limited Partnership in accordance with the requirements of Section 15525 or Section 15525.5 of the California Corporations Code.

2.04 Subject to any other provision of this Agreement, after the formation of the Partnership a person may be admitted as an additional Limited Partner with the written consent of all General Partners, on the recording of an amendment to the original Certificate of Limited Partnership in accordance with the requirements of Section 15525 or Section 15525.5 of the California Corporations Code.

2.05 Notwithstanding any other provisions of this Agreement, before any person is admitted to this Partnership as an additional General, additional Limited, or substituted Limited Partner, he shall agree in writing to be bound by all of the provisions of this Agreement.

## ARTICLE III.
### FINANCIAL

3.01 The amount of cash and the description of and the agreed value of the other property contributed by the General and Limited Partners of Harwood Investment Company are set forth in exhibit "A" attached hereto and incorporated as a part hereof. Exhibit "A" is the balance sheet as of October 2, 1976 of the said Partnership business. Each General Partner hereof contributes his capital interest in the said Partnership as shown on the said balance sheet except, however, as such interest shall be adjusted for the results of operation and withdrawals of capital and profits prior to the effective date of this agreement. Arthur H. Harwood and Morris J. Harwood each agree to each contribute twenty percent (20%) of his capital interest to the respective trustee of his family trusts.

3.02 In addition to the initial capital contributions of the Partners each Partner may voluntarily make additional contributions to the capital of this Partnership only in such amounts as may from time to time be agreed upon by all the General Partners.

3.03 Limited Partners shall not be required to contribute to the capital of this Partnership or to its creditors any additional money or property, the liability of each Limited Partner being limited to the amount of his initial capital, as set forth in this Agreement.

3.04 No Partner shall receive any interest on his contribution to the Partnership capital, except, however, Suzanne Harwood Rubattino shall be entitled to a payment of $100,000 per year for thirty (30) years, irrespective of Partnership profits, as a guaranteed payment for the use of her capital by the Partnership, which shall be deducted before computing the net profits or losses of the Partnership.

3.05 No Partner may withdraw any portion of the capital of the Partnership, and no Partner, General or Limited, shall be entitled to the return of his contribution to the capital of the Partnership except on dissolution of the Partnership.

3.06 Subject to the provisions of Paragraph 3.07 of this Agreement, the net profits of the Partnership and any net losses suffered by the Partnership shall be borne by the Partners in the following proportions:

### General Partners

Arthur H. Harwood ........................................................ 17.78 percent
Morris J. Harwood ........................................................ 17.78 percent

### Limited Partners

Arthur H. Harwood ........................................................ 17.77 percent
Morris J. Harwood ........................................................ 17.77 percent
Suzanne Harwood Rubattino ............................................. 11.12 percent
Bank of America NT & SA
  Trustee of the Arthur H. Harwood 1976 Family Trusts ......... 8.89 percent
Bank of America NT & SA
  Trustee of the Morris J. Harwood 1976 Family Trusts .......... 8.89 percent

3.07 No limited Partner shall be liable or subject to any obligations, losses, debts, or liabilities of the Partnership in excess of the amount in his capital account. Any losses of the Partnership in excess of the amount of the capital of the Partnership shall be borne by the General Partners in the same proportions as they share in the profits of the Partnership.

3.08 At all times the General Partners shall maintain or cause to be maintained true and proper books, records, reports, and accounts in which shall be entered fully and accurately all transactions of the Partnership.

3.09 All books, records, reports, and accounts, together with this Agreement and the Certificate of Limited Partnership and any amendments thereto, shall at all times be kept and maintained at the principal place of business of this Partnership.

3.10 All books, records, reports, and accounts shall be open to inspection by any Partner or his duly authorized representatives, on reasonable notice, at any reasonable time during business hours, for any purpose reasonably relating to his respective interest as a Partner, and said Partner or representative shall have the further right to make copies or excerpts therefrom.

3.11 The Partnership books shall be kept on an accrual basis.

3.12 The fiscal year of the Partnership shall be the calendar year.

3.13 An individual capital account shall be maintained for each General and Limited Partner consisting of his share of the initial capital of the Partnership, any additional contributions to the Partnership capital made by him pursuant to this Agreement, and any amounts transferred from his income account to his capital account pursuant to this Agreement.

3.14 An individual income account shall be maintained for each General and Limited Partner. At the end of each fiscal year each Partner's share of the net profits or net losses of the Partnership shall be credited or debited to and his withdrawals during such fiscal year deducted from his income account. After such amounts have been credited or debited to and deducted from a Partner's income account, any balance or deficit remaining in such account shall be transferred to or charged against such Partner's capital account; provided, however, that no limited partner may withdraw any portion of his distributive share of the net profits of the Partnership without the consent of all the General Partners.

3.15 Notwithstanding anything to the contrary herein, the Partnership shall distribute to each Limited Partner an amount sufficient to enable each Limited Partner to pay and discharge any tax liability on his share of undistributed partnership profits and any trustee fee or other reasonable costs incurred by the trustee in administration of the Limited Partnership interests.

## ARTICLE IV.
### RIGHTS, POWERS, DUTIES, AND RESTRICTIONS, OF PARTNERS

4.01 General Partners shall have full and exclusive charge and control of the management, conduct, and operation of the Partnership in all respects and in all matters.

4.02 General Partners shall devote such time to this Partnership as shall be necessary to conduct this Partnership in an efficient manner.

4.03 All General Partners shall have equal rights in the management and conduct of the Partnership business, except that Arthur H. Harwood shall have the right to execute all deeds and conveyances on behalf of the Partnership.

4.04 Except as otherwise expressly provided in this Agreement, a General Partner shall have all the rights and powers of a Partner in a Partnership without Limited Partners and shall be subject to all the restrictions imposed on General Partners by the Uniform Limited Partnership Act of the State of California or imposed on a Partner in a Partnership without Limited Partners.

4.05 As compensation for his services in and about the Partnership business, each General Partner shall be entitled to such salaries as shall be mutually agreed upon by all of the General Partners which shall be deducted by the Partnership as an ordinary and necessary expense of the Partnership before determination of net profits.

\* \* \* \* \* \* \*

4.07 Notwithstanding any other provision of this Agreement, the Limited Partners are hereby given the right and power to vote on any or all of the following matters which affect the basic structure of the Partnership:

      (a) Election or removal of General Partners;
      (b) Termination of the Partnership;
      (c) Amendment of the Partnership Agreement;
      (d) Sale of all or substantially all of the assets of
           the Partnership.

On such matters each Partner shall have one vote for each percent of Partnership net profits set out in Paragraph 3.06 of this Agreement.

\*     \*     \*     \*     \*     \*     \*

## ARTICLE V.
### TERMINATION OF PARTNERSHIP

5.01 If during the existence of the Partnership one or more General or Limited Partners shall die or be declared incompetent, the remaining Partners agree, subject to the provisions of this Paragraph 5.01 to continue the business of the Partnership until the end of the quarter in which such event or events occur, and such death or incompetence shall not immediately dissolve the partnership, and the continuing partnership shall be the same partnership for all purposes until the end of said quarter. The quarters are measured in three month increments commencing with January 1, i.e., ending March 31, June 30, September 30 and December 31. It is the intention of the parties that the Partnership shall continue through the then current quarter, and that no decrease in the personnel thereof shall effect a dissolution of the Partnership until the end of said quarter unless the Partnership shall be terminated by majority action as hereinbelow specifically provided.

5.02 Each Partner, General and Limited, agrees for himself and hereby obligates his heirs, executors, administrators and assigns to permit the Partnership to use (subject to the terms of this Agreement) his contribution in or to the business for the uses herein specified, until the dissolution of the Partnership.

5.03 In the event of death or incompetence of one or more General or Limited Partners, a majority in interest of the remaining Partners may elect at their option at the end of the quarter in which event or events occur to form a successor partnership and to continue the partnership business, in which event full payment shall be made in cash or in the form of promissory notes by the said successor Partnership within ninety (90) days for the amount of the book value of the interest of such deceased or incompetent Partner or Partners and for the book value of the interest of any Partner who does not become a Partner in the successor Partnership. Said promissory notes shall be payable in ten equal annual installments with interest at eight percent (8%) per annum. "Book value" for this purpose includes the Partner's capital contribution, his loans (if any) to the Partnership, and his

share in any unwithdrawn Partnership profits, adjusted for his share in any undivided Partnership loss, all as set forth in the duly audited Partnership balance sheet at the end of the fiscal year in question. In the determination of said book value no allowance shall be made or included for "goodwill."

5.04 If any General or Limited Partner shall withdraw or be adjudicated a bankrupt during the existence of the Partnership, the remaining partners shall have the same rights and duties as if the withdrawing or bankrupt Partner had died upon such date, except that any successor Partnership may, at its election, pay the book value of the interest of the said withdrawing or bankrupt Partner in three equal annual installments, without interest, the first such installment to be due on the ninetieth (90th) day after the end of the quarter in which such event shall occur.

5.05 The Partnership may, however, be dissolved at any time by a majority in interest of all Partners, in which event they shall give written notice to the other Partners of their election to dissolve by addressing the same to each Partner at his last known address according to the Partnership records, and depositing the same in the United States mail, postage prepaid. The notice shall specify the date fixed for the dissolution of the Partnership, and upon such date the Partnership shall be dissolved and liquidated and the assets thereof distributed in the manner provided herein below.

5.06 In the event of dissolution of the Partnership and complete liquidation of all of the Partnership assets, all of the partners, General and Limited, shall share in the profits and losses realized in the liquidation process in the same proportions as set forth in Paragraph 3.06 above, and there shall be no preference upon such final liquidation as between General and Limited Partners, except that the liability of the Limited Partner for Partnership obligations shall be limited as set forth in Paragraph 3.07.

5.07 Upon complete liquidation of the Partnership assets, funds thus realized shall be first applied to pay Partnership debts, and any excess shall be distributed among the Partners in accordance with their respective entitlements. In the event that installment distributions are made, no Partner shall receive any installment distributions large enough to reduce his investment in the Partnership below an amount at least equal to his share of any possible loss.

5.08 Notwithstanding any other provision of this Agreement if Arthur H. Harwood and Morris J. Harwood predecease Suzanne Harwood Rubattino she shall have the right and option to sell her full interest in the Partnership to the Partners of any successor Partnership formed pursuant to this Agreement at an amount equal to the fair market value of her Partnership interest. Said value shall be determined by an appraiser to be selected with the mutual consent of Suzanne Harwood Rubattino and a majority of the successor Partners. In determining fair market value the appraiser shall value all assets of the Partnership including lands, timber, and investments at their fair cash market value, except however no allowance shall be made or included for "goodwill."

## ARTICLE VI.
### MISCELLANEOUS CLAUSES AND REPRESENTATIONS

\*　　\*　　\*　　\*　　\*　　\*　　\*

6.03 All questions with respect to the construction of this Agreement and the rights and liabilities of the parties hereto shall be governed by the laws of the State of California.

6.04 Subject to the restrictions against assignment as herein contained, this Agreement shall inure to the benefit of and shall be binding upon the assigns, successors in interest, personal representatives, estates, heirs, and legatees of each of the parties hereto.

\*　　\*　　\*　　\*　　\*　　\*　　\*

6.06 This Agreement contains the entire understanding among the Partners and supersedes any prior written or oral agreements between them respecting the subject matter contained herein. There are no representations, agreements, or understandings, oral or written, between and among the Partners relating to the subject matter of this Agreement which are not fully expressed herein.

6.07 This Agreement is subject to amendment only with the unanimous consent of all of the Partners.

On December 29, 1976, Bud and Virginia gave an 8.89-percent limited partnership interest in HIC to Bank of America NT & SA, trustee for the Arthur H. Harwood 1976 Family Trust, for the benefit of their children.

On December 29, 1976, Jack gave an 8.89-percent limited partnership interest in HIC to Bank of America NT & SA, trustee for the Morris J. Harwood 1976 Family Trust, for the benefit of his children. Margaret consented to have the gift made one-half by each of Morris and Margaret.

In 1973, HIC applied for a loan from the Federal Land Bank. Submitted with the loan application were balance sheets as of December 31, 1972, for Belva, Jack, Bud, and Virginia. Belva's interest in HIC was shown as having a book value of $603,846 and an appraised value of $2,622,196.[2] The one-third interest in HIC of Jack was shown as having a book value of $544,271 and appraised values of $2,562,620. The one-third interest in

---

[2]This balance sheet was evidently prepared under the assumption that Belva held a one-third interest on HIC on Dec. 31, 1972. The parties have stipulated that Belva held only a one-sixth interest in HIC on Dec. 31, 1972. We take it that the above-cited balance sheet includes in Belva's interest in HIC the one-sixth interest transferred to Bud, Jack, and Suzanne pursuant to the Dec. 3, 1971, order of the Superior Court of California, county of Mendocino.

HIC of Bud and Virginia was shown as having a book value of $546,783 and an appraised value of $2,565,133.

In August 1976, an attorney representing HIC asked Robert E. Kleiner, a professional appraiser who had previously done work for HIC and was familiar with some of its property, to prepare a report appraising HIC, such appraisal to be used by HIC legal and accounting personnel in connection with the conveyance by gift of interests in HIC. Kleiner prepared a report as requested, with the assistance of Raymond E. Granvall, Jr. HIC personnel assisted Kleiner and Granvall by providing information they needed to prepare their appraisal. The report was completed on September 3, 1977, and appraised the December 31, 1976, net asset value of HIC at $20,550,000.

Beginning in the late 1960's, HIC, through Bud and others, began bidding on forest service contracts. These contracts represented the right to harvest timber at some specified future date, typically 4 or 5 years after the date of acquisition of the contract. During the middle 1970's, including 1976 and 1977, HIC bid far more for forest service contracts than the spot price for comparable timber at the time of the bids. Bud was willing to bid in this manner because he expected timber prices to rise between the time of the bid and the time the timber would be harvested.

After concessions, respondent contends that the value of the interest in HIC that Belva gave to Jack and Bud on January 1, 1973, was $904,341.67;[3] that the value of the interest in HIC that Jack, Bud, and Virginia gave to Suzanne on January 1, 1973, was $301,386.94;[4] and that the value of the 8.89-percent limited partnership interests that Bud and Virginia and Jack and Margaret gave on December 29, 1976, to trusts for the benefit of their respective children was $1,278,826.50.[5] Respondent also contends that no consideration was paid by Suzanne in exchange for the interest in HIC she received on January 1, 1973, and that restrictive clauses in the various HIC partnership agreements, and savings clauses in the Harwood Family Trust agreements, have no effect on the gift tax deficiency he determined.

---

[3] In the deficiency notice, respondent determined that the value of this interest was $1,311,098.
[4] In the deficiency notice, respondent determined that the value of this interest was $430,553.
[5] In the deficiency notice, respondent determined that the value of this interest was $1,826,895.

## OPINION

### *Issue 1*

Section 2501[6] imposes a tax on the transfer of property by gift by any individual. Section 2512(b) provides that "Where property is transferred for less than an adequate and full consideration in money or money's worth, then the amount by which the value of the property exceeded the value of the consideration shall be deemed a gift." The regulations further provide that:

Transfers reached by the gift tax are not confined to those only which, being without a valuable consideration, accord with the common law concept of gifts, but embrace as well sales, exchanges, and other dispositions of property for a consideration to the extent that the value of the property transferred by the donor exceeds the value in money or money's worth of the consideration given therefor. However, a sale, exchange, or other transfer of property made in the ordinary course of business (a transaction which is bona fide, at arm's length, and free from any donative intent), will be considered as made for an adequate and full consideration in money or money's worth. * * * [Sec. 25.2512–8, Gift Tax Regs.]

The Supreme Court has interpreted these provisions as follows (*Commissioner v. Wemyss*, 324 U.S. 303, 306–307 (1945)):

Congress chose not to require an ascertainment of what too often is an elusive state of mind. For purposes of the gift tax it not only dispensed with the test of "donative intent" it formulated a much more workable external test, that where "property is transferred for less than an adequate and full consideration in money or money's worth," the excess in such money value "shall, for the purpose of the tax imposed by this title, be deemed a gift * * *." And Treasury Regulations have emphasized that common law considerations were not embodied in the gift tax.

To reinforce the evident desire of Congress to hit all the protean arrangements which the wit of man can devise that are not business transactions within the meaning of ordinary speech, the Treasury Regulations make clear that no genuine business transaction comes within the purport of the gift tax by excluding "a sale, exchange, or other transfer of property made in the ordinary course of business (a transaction which is bona fide, at arm's length, and free from any donative intent)." Treas. Reg. 79 (1936 ed.) Art. 8. Thus on finding that a transfer in the circumstances of a

---

[6]All section references are to the Internal Revenue Code of 1954 as amended and in effect during the years in issue, unless otherwise indicated, and all Rule references are to the Tax Court Rules of Practice and Procedure.

particular case is not made in the ordinary course of business, the transfer becomes subject to the gift tax to the extent that it is not made "for an adequate and full consideration in money or money's worth." * * * [Fn. ref. omitted.]

Petitioners contend, and respondent denies, that the January 1, 1973, transaction wherein Belva transferred her one-sixth interest in HIC to Bud and Jack in exchange for a promissory note was a transfer in the ordinary course of business and hence was not subject to the gift tax, even if the value of her interest in HIC exceeded the value of the note she received therefor.

Transactions within a family group are subject to special scrutiny, and the presumption is that a transfer between family members is a gift. *Estate of Reynolds v. Commissioner*, 55 T.C. 172, 201 (1970). We do not believe that a transfer by a mother to her sons of her interest in the family partnership, structured totally by the family accountant, with no arm's-length bargaining, can be characterized as a transaction in the ordinary course of business. We hold that Belva made a gift to Bud and Jack in the amount that the value of the one-sixth interest in HIC which she transferred to them exceeded the value of the note she received therefor.

## Issue 2

As noted in the discussion under Issue 1, where property is transferred for less than an adequate consideration, the amount by which the value of the property transferred exceeds the value of the consideration received therefor is a taxable gift, unless it can be established that the transfer occurred in the ordinary course of business. Petitioners contend that the January 1, 1973, transaction wherein Jack gave up a one thirty-sixth interest in HIC, Bud and Virginia each gave up a one seventy-second interest in HIC and Suzanne gained a one-eighteenth interest in HIC was a transfer of property made in the ordinary course of business, and, in the alternative, if that transaction constituted gifts from Jack, Bud, and Virginia to Suzanne, that the $300,000 payment made to HIC by Suzanne in 1978 should be recognized as consideration for the one-eighteenth interest she received on January 1, 1973, and should reduce accordingly the amount of the gifts made on

that day.[7] Respondent denies both these contentions.

Transactions within a family group are subject to special scrutiny, and the presumption is that a transfer between family members is a gift. *Estate of Reynolds v. Commissioner,* 55 T.C. at 201. We do not believe that the intrafamily adjustment in interests in the family partnership here in issue, which was structured completely by the family accountant, with no arm's-length bargaining, can be characterized as a transfer made in the ordinary course of business.[8] We note that the January 1, 1973, partnership agreement states that only Bud and Jack are to have management responsibilities, which makes clear that this transaction was not designed to acquire Suzanne's services for the partnership. We hold that Bud and Virginia, and Jack, made taxable gifts to Suzanne in 1973 in the amount that the fair market value of the interests in HIC transferred to Suzanne exceeded the value of any consideration received therefor.

We must next determine whether $300,000 Suzanne paid to HIC on October 19, 1978, constitutes consideration for the one-eighteenth partnership interest she received on January 1, 1973. Petitioners bear the burden of proof on this issue. Rule 142(a).

No note or other evidence of indebtedness was created in 1973 when Suzanne received her additional one-eighteenth interest in HIC. In 1978, one of respondent's agents pointed out to Convery that no payment had ever been received by HIC in connection with Suzanne's acquisition of an interest there-

---

[7]Petitioners also contend that because Suzanne acquired the additional one-eighteenth interest directly from the partnership, rather than from Bud and Jack, there was no "transfer" and therefore no gift. They base this argument on secs. 706 and 721, which, they argue, do not treat such an acquisition of a partnership interest as a taxable event to the other partners (here Jack and Bud). This argument misses the mark. Secs. 706 and 721 deal solely with the income tax consequences and nonrecognition of gain or loss of acquiring a partnership interest and have no relevance to the issue before us. The relevant gift tax regulation makes clear that the transfer of an additional one-eighteenth interest in HIC to Suzanne is a gift from Bud, Virginia, and Jack, to the extent it was not made for adequate and full consideration, whether transferred from Bud, Virginia, and Jack, or from HIC with offsetting reductions in the partnership interests of Bud, Virginia, and Jack: "all transactions whereby property or property rights or interests are gratuitously passed or conferred upon another, regardless of the means or device employed, constitute gifts subject to tax." (Sec. 25.2511–1(c), Gift Tax Regs.)

[8]*Anderson v. Commissioner,* 8 T.C. 706 (1947), and *Weller v. Commissioner,* 38 T.C. 790, 806 (1962), cited by petitioners in support of their position, are distinguishable on their facts in that they involved arm's-length sales. *Anderson* involved a series of sales of interests to junior executives designed to further the corporate business by assuring continued good management. In *Weller,* the seller of a partnership interest tried unsuccessfully to sell his interest before agreeing to the sale challenged by respondent.

in. Subsequently, Suzanne paid $300,000 to HIC. Suzanne was not called to testify concerning the nature of this payment, although she was available to testify. No direct evidence was put in the record connecting this payment to the January 1, 1973, transaction. Under these circumstances, we cannot say that petitioners have met their burden of proving that the $300,000 payment in question was consideration paid in exchange for the one-eighteenth partnership interest acquired by Suzanne on January 1, 1973.

Petitioners do not contend that any other consideration was paid to HIC or to Bud, Virginia, or Jack in exchange for the one-eighteenth interest transferred to Suzanne on January 1, 1973. We therefore hold that Bud and Virginia each made a gift equal to the full value of a one seventy-second interest in HIC and that Jack made a gift equal to the full value of a one thirty-sixth interest in HIC as of January 1, 1973.

### Issue 3

Restrictive provisions in a partnership agreement which limit the amount received from the partnership by a withdrawing partner or the estate of a deceased partner to the book value of his partnership interest are not binding upon respondent for gift tax purposes. *Spitzer v. Commissioner*, 153 F. 2d 967 (8th Cir. 1946); *James v. Commissioner*, 3 T.C. 1260 (1944), affd. 148 F.2d 236 (2d Cir. 1945); *Berzon v. Commissioner*, 63 T.C. 601, 612–613 (1975), affd. 534 F.2d 528 (2d Cir. 1976). Such an agreement is a factor affecting value which may be considered along with other factors in determining value. *James v. Commissioner, supra; Spitzer v. Commissioner, supra; Berzon v. Commissioner, supra*. Petitioners contend that the aforementioned cases should no longer be followed insofar as they hold that restrictive clauses in partnership agreements are not binding upon respondent for gift tax purposes, and, in the alternative, that the restrictive provisions[9] in the January 1, 1973, and December 29, 1976, HIC partnership agreements depressed the value of interests in HIC to tneir book value.

From January 1, 1955, to December 31, 1972, HIC was operated under a partnership agreement dated January 1, 1955. On January 1, 1973, a new partnership agreement was

---

[9]These various provisions are set out verbatim in our findings of fact.

adopted, which was itself replaced by an agreement dated December 29, 1976. Each of these agreements contains provisions to the effect that if a partner died or became incompetent, the remaining partners could continue the partnership business by paying book value for the dead or incompetent partner's interest, and that if a partner withdrew or was adjudicated a bankrupt, the remaining partners would have the same rights as if the partner died and, in addition, the partnership, itself, could elect to buy out the partner at book value.[10] According to petitioners, this provision was inserted in each of the HIC partnership agreements for the business purpose of preventing disputes in the event a partner died or wished to withdraw from the partnership. Petitioners contend that "In view of the fact of the existence of the strong business motive, the Court should hold that the agreements fixed the value at book."

It has been the consistent view of this Court in cases where the stockholder is under no obligation to sell by reason of his contract, but has simply agreed to offer his stock to others on certain stated terms if he should desire to sell, that such an agreement does not have the effect of limiting the value upon which the Government may compute its tax to the amount at which the stock is to be offered if the owner decides to sell. * * * [*James v. Commissioner*, 3 T.C. at 1264.]

As we have pointed out, "One rationale for rejecting the formula price as the absolute determinative of fair market value is that such a figure does not represent the value of all of the rights inherent in * * * ownership." *Estate of Reynolds v. Commissioner*, 55 T.C. 172, 190 (1970).

The interests, the transfer of which gave rise to the present controversy, carried with them rights additional to the rights of their holders to receive certain payments upon withdrawal from HIC. The fact that restrictive provisions were put in the HIC partnership agreements for business reasons is irrelevant to the question before us, since the reasons for the adoption of the restrictive provisions have no effect on the various rights, other than those derived from the restrictive provisions, that were inherent in interests in HIC.

---

[10]Compare *True v. United States*, 547 F. Supp. 201 (D. Wyo. 1982), in which the restrictive agreement was absolute, providing that interests must be sold by withdrawing partners and must be bought by remaining partners at book value.

Respondent concedes that the restrictive provisions are a factor to be considered in determining the value of partnership interests in HIC. The parties disagree as to the magnitude of the impact upon value of that factor.

Petitioners first argue that a gift by a partner of part of his interest in HIC would be a partial withdrawal under the restrictive clauses of the partnership agreements, so that HIC would have the right to purchase the donated interest from the donee at book value. This contention does not withstand close scrutiny.

If a gift of part of a partner's interest constituted a withdrawal with respect to that partial interest, then, a fortiori, a sale of part of a partner's interest would constitute a withdrawal,[11] giving HIC the right to purchase that interest from its buyer at book value. This interpretation of the various HIC partnership agreements strikes us as bizarre, particularly in light of the fact that it would have been easy to require partners wishing to sell or to give away portions of their interests in HIC to first offer those interests to HIC at book value. In the absence of a provision for such a right of first refusal, and considering that petitioners failed to cite a single authority in support of their interpretation of the restrictive clauses,[12] we cannot accept the argument that any prospective purchaser of an interest in HIC would have been concerned that HIC could, immediately following a purchase of such an interest, force the purchaser to sell his interest at book value.[13]

---

[11]In their argument on Issue 2, petitioners point out that sec. 706 carefully distinguishes between sales of a partnership interest and withdrawals from a partnership, and provides for different tax treatment of these two types of events. To reach petitioners' preferred interpretation of the restrictive provision, we would thus have to impute careless draftsmanship to its author.

[12]Indeed, petitioners implicitly rejected this interpretation by valuing the one-sixth interest in HIC which Belva transferred to Bud and Jack on Jan. 1, 1973, at more than book value.

[13]The relevant sections of the California Corporations Code provide:

Sec. 15026. Interest in partnership

A partner's interest in the partnership is his share of the profits and surplus, and the same is personal property.

Sec. 15027. Conveyance of interest in partnership

(1) Effect of conveyance; assignee's rights. A conveyance by a partner of his interest in the partnership does not of itself dissolve the partnership, nor, as against the other partners in the absence of agreement, entitle the assignee, during the continuance of the partnership, to interfere in the management or administration of the partnership business or affairs, or to require any information or account of partnership transactions, or to inspect the partnership books; but it merely entitles the assignee to receive in accordance with his contract the profits to which the assigning partner would otherwise be entitled.

Petitioners also rely on the report and testimony of William Haynes, an expert witness, to establish the effect of the HIC partnership agreement's restrictive provisions on the value of an interest in HIC. Haynes suggested that a potential purchaser of a minority interest in HIC would require a risk premium based upon HIC's small size and the cyclical nature of its business. Such a risk premium is irrelevant to the issue of the impact upon value of the restrictive provisions.

Haynes next determined that a lack of marketability discount of 25 percent was appropriate, on the ground that a person acquiring an interest in HIC "may not ever be able to get out any more than the book value, so there would be a lack of marketability of this partnership interest, due in part [to] the restrictive provisions, * * * and also due to the * * * well known fact that partnership interests are highly illiquid anyway."

Haynes' proposed lack of marketability discount is founded both on the restrictive provisions of the HIC partnership agreements and on the general illiquidity of partnership interests. Since we are here considering only the effect of the restrictive provisions on the value of interests in HIC, we cannot accept the full 25-percent discount suggested by Haynes.[14]

The interests in HIC transferred to the Harwood Family Trusts in 1976 were both held in trust. It is, of course, unlikely that the trusts will ever die or be adjudicated incompetent or bankrupt.[15] The trusts thus insulate their beneficiaries against the HIC restrictive agreements. Presumably, a prospective purchaser of any of the interests in HIC here being valued could have elected to take title to such interest through a trust, and thus avoid to some extent the effect of the restrictive clauses.

We believe that the restrictive clauses did have a depressing effect on value. See *Moore v. Commissioner*, 3 T.C. 1205, 1211

---

(2) Assignee's rights upon dissolution. In case of a dissolution of the partnership, the assignee is entitled to receive his assignor's interest and may require an account from the date only of the last account agreed to by all the partners. [Cal. Corp. Code secs. 15026–15027 (West 1977); see also *Security First National Bank v. Whittaker*, 241 Cal. App. 2d 554, 50 Cal. Rptr. 652, 653-654 (1966).]

[14]Haynes did not explain what portion of his proposed 25-percent discount for lack of marketability was due to the restrictive clauses rather than the illiquidity of partnership interests in general.

[15]Most of the assets held by the trusts were interests in HIC.

(1944); *Berzon v. Commissioner*, 63 T.C. at 612–613 (1975); *Kline v. Commissioner*, 44 B.T.A. 1052, 1056 (1941), affd. 130 F.2d 742 (3d Cir. 1942), cert. denied 317 U.S. 697 (1942). We find and hold that the restrictive clauses in the HIC partnership agreements of January 1, 1973, and December 29, 1976, negatively affected the value of minority interests in HIC and must be taken into account in valuing the gifts in issue.

### *Issue 4. Valuation of the 1976 Gifts of Interests in HIC*

Care should be taken to arrive at an accurate valuation of any interest in a business which the donor transfers without an adequate and full consideration in money or money's worth. The fair market value of any interest in a business, whether a partnership or a proprietorship, is the net amount which a willing purchaser, whether an individual or a corporation, would pay for the interest to a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of the relevant facts. The net value is determined on the basis of all relevant factors including—

(1) A fair appraisal as of the date of the gift of all the assets of the business, tangible and intangible, including good will;

(2) The demonstrated earning capacity of the business; and

(3) The other factors set forth in paragraph (f) of section 25.2512–2 relating to the valuation of corporate stock, to the extent applicable. [Sec. 25.2512–3(a), Gift Tax Regs.]

(f) *Where selling prices or bid and asked prices are unavailable.* If the provisions of paragraphs (b), (c), and (d) of this section are inapplicable because actual sale prices and bona fide bid and asked prices are lacking, then the fair market value is to be determined by taking the following factors into consideration:

(1) In the case of corporate or other bonds, the soundness of the security, the interest yield, the date of maturity, and other relevant factors; and

(2) In the case of shares of stock, the company's net worth, prospective earning power and dividend-paying capacity, and other relevant factors.

Some of the "other relevant factors" referred to in subparagraphs (1) and (2) of this paragraph are: the good will of the business; the economic outlook in the particular industry; the company's position in the industry and its management; the degree of control of the business represented by the block of stock to be valued; and the values of securities of corporations engaged in the same or similar lines of business which are listed on a stock exchange. However, the weight to be accorded such comparisons or any other evidentiary factors considered in the determination of a value depends upon the facts of each case. * * * [Sec. 25.2512–2(f), Gift Tax Regs.]

Bud and Virginia, and Jack, respectively, made gifts of 8.89-percent limited partnership interests in HIC on December 29, 1976. The parties disagree as to the December 29, 1976, value

of those gifts. Each party relies on the reports and testimony of its expert witnesses.

Petitioners contend that we should accept the valuation prepared by their expert, Charles Stark, using a capitalization of income method.

Stark appraised an 8.9-percent limited partnership interest in HIC as of December 29, 1976, and 16.7-percent and 2.8-percent partnership interests in HIC as of January 1, 1973. He determined the average income of HIC for the 5-year period prior to January 1, 1973, and for the 4-year period prior to December 29, 1976, and capitalized the resulting average yearly incomes using a capitalization rate of 5. He then allowed a 35-percent discount for illiquidity and lack of control.

Stark's appraisal is accurate only if prospective buyers would value the interests in question by capitalizing past earnings of HIC as suggested by Stark. We are not persuaded that in an industry as cyclical as the forest products industry (petitioners repeatedly stressed the cyclical nature of HIC's business), average past earnings of HIC would be of overriding interest to a prospective purchaser. HIC's future earnings depended on the future price it could get for its timber assets, which can hardly be predicted by looking at average past earnings for 5- or 4-year periods. We note that in 1976, Bud expected timber prices to rise, as evidenced by his willingness to bid substantially more than the spot price for forest service contracts for future access to timber. Additionally, we are not satisfied that Stark has adequately supported his capitalization rate of 5. A small change in this rate would have a major effect on the appraised value. We therefore decline to accept Stark's capitalization of income approach to valuing interests in HIC in either 1973 or 1976.

We find additional support for refusing to rely on a capitalization of income approach in that HIC's business consisted solely of acquiring timber for the use of its affiliated companies. HIC's value was thus directly tied to the value and expected future value of its timber holdings, and potential purchasers would most likely be more interested in HIC's net asset value than in its past earnings. See *Estate of Andrews v. Commissioner*, 79 T.C. 938, 944 (1982); *Estate of Heckscher v. Commissioner*, 63 T.C. 485, 493 (1975).

Respondent relies primarily upon a report estimating the December 31, 1976, net asset value of HIC, prepared by Robert E. Kleiner and Raymond E. Granvall, Jr., which was completed September 3, 1977. An attorney representing HIC asked Kleiner in August 1976, to prepare this report for use by HIC's legal and accounting personnel in connection with the financial aspects of the conveyance of interests in HIC by gift. Kleiner had previously done work for HIC and was familiar with its holdings; HIC personnel also assisted Kleiner and Granvall in the preparation of the report.

Petitioners object to the introduction of the Kleiner-Granvall report on the ground that it is unfair to allow respondent to use an expert report paid for by petitioners. The Kleiner-Granvall report was not prepared in contemplation of the present litigation. We do not believe that any compelling unfairness in allowing respondent to introduce the Kleiner-Granvall report is evident in this record. We therefore reaffirm our ruling at trial that the report is admissible.

The Kleiner-Granvall report contains three sections. The first section values the HIC timber properties. Each such property is discussed and valued separately, as to land value, timber value, and value of improvements, if any. Relying on a comparable sales method, the report values the various timber holdings of HIC at $28,200,000.

The second part of the Kleiner-Granvall report values the plant property of HIC, that is, two sawmills and various related machinery. Using both a cost approach and a comparable sales approach, the report values the plant property at $1,700,000.

The third section of the Kleiner-Granvall report considers other assets of HIC, primarily current assets and amounts due from affiliates, and liabilities of HIC. The report finds total other assets of $5,611,697 and total liabilities of $14,967,792. By summing the aforementioned values, Kleiner and Granvall arrive at a total net asset value (approximate) of $20,500,000.

Petitioners engaged Paul R. Kevin, Jr., to appraise the net asset value of HIC as of January 1, 1973, and December 29, 1976. In his appraisal of the December 29, 1976, net asset value, Kevin assumed that 101,169,000 board feet of timber, out of HIC's total timber holdings of 252 million board feet, should be valued as part of the land value, rather than as

stumpage.[16] Kevin allowed a value of $150 per acre for the value of such timber.

In valuing an additional 82,700,000 board feet of HIC's timber, Kevin assumed that only 10 million board feet of such timber would be cut per year for 25 years, and arrived at a valuation for this timber by reducing to present value, after an allowance for inflation, the sum of the proceeds from 25 years of cutting 10 million board feet per year. After a careful study of the record, we are not satisfied that Kevin has adequately supported either of these assumptions. We believe that the Kleiner-Granvall report, which was based on a comparable sales analysis of the value of all of HIC's timber, and so makes neither of the aforementioned assumptions, provides a more reliable estimate of HIC's net asset value as of late 1976.

On the basis of the foregoing, and the entire record, we find and hold that the net asset value of HIC on December 31, 1976, was $20,550,000. This finding does not end the matter before us, for we must still determine what, if any, discounts apply in valuing 8.89-percent limited partnership interests in HIC.

Petitioners, relying on the testimony and report of Stark, contend that the stock of publicly traded forest products companies traded during 1976 at an average 60-percent discount from their net asset values. Respondent's expert, Edward Bard, allowed a 30-percent discount from net asset value in valuing minority interests in HIC. Bard derived this discount from a study which found that nondiversified closed-end investment companies traded at an average 26.4-percent discount from their net asset values. We believe that these two discounts from net asset value reflect the fact that minority shareholders in a forest products corporation or a closed-end investment company have no right to receive their pro rata share of net asset value. We agree that the limited partnership interests in HIC may be analogized to a stock interest in a forest products company or a closed-end investment company in this respect, and that a discount to reflect this fact is appropriate. However, the data relied upon by Stark in reaching his proposed discount of 60 percent is unfortunately incomplete, and we do not believe that he adequately substantiated his suggested 60-percent discount.

---

[16]The term "stumpage" denotes standing trees.

The stock of publicly traded forest products companies and closed-end investment companies is traded on public markets and is therefore readily marketable. Limited partnership interests in HIC were not regularly traded on any market, and thus represent relatively illiquid investments. We believe that an additional discount must be allowed to reflect the lack of marketability of limited partnership interests in HIC.[17]

Stark suggested that a lack of marketability discount of between 20 percent and 50 percent is appropriate, and chose to apply a discount of 35 percent. Again, he failed to adequately substantiate the discount he chose to apply.

We have found that on December 31, 1976, HIC had a net asset value of $20,550,000. Neither party contends that any significant change in net asset value occurred between December 29, 1976, and December 31, 1976, and we therefore accept $20,550,000 as HIC's net asset value on the valuation date. Of this sum, $1,826,895 is the pro rata share of an 8.89-percent interest in HIC.

Doing the best that we can with the record before us, we find and hold that this amount must be discounted by 50 percent to reflect the fact that the interests in HIC being valued were minority interests, were not publicly traded, and were subject to the restrictive clause in the HIC partnership agreement (see our discussion in Issue 3 above). We thus find that the December 29, 1976, value of an 8.89-percent limited partnership interest in HIC is $913,447.50.

### Issue 5. Valuation of the 1973
### Gifts of Interests in HIC

On January 1, 1973, Belva transferred to Jack and Bud a one-sixth interest in HIC in exchange for a promissory note in the amount of $573,365. On that same date, Bud and Virginia, and Jack, respectively, transferred to Suzanne one thirty-sixth partnership interests in HIC. The parties disagree as to the January 1, 1973, value of these partnership interests. Each

---

[17]See *Estate of Andrews v. Commissioner*, 79 T.C. 938, 953 (1982); *Estate of Brownell v. Commissioner*, T.C. Memo. 1982–632. We note that in *Estate of Andrews v. Commissioner, supra*, respondent's expert, Edward Bard, allowed a lack of marketability discount in addition to a minority or lack of control discount. 79 T.C. at 943.

party relies on the reports and testimony of its expert witnesses.

Balance sheets submitted by Belva, Jack, Bud, and Virginia, in connection with an application by HIC for a loan from the Federal Land Bank, show HIC as having a net asset value of $7,749,950 on December 31, 1972. Respondent contends that the net asset value for HIC reflected on these loan applications is correct, but concedes that a 30-percent discount for "lack of marketability" and "minority interest" is appropriate in valuing the interests at issue.

Petitioners' expert, Kevin, concluded that HIC had a net asset value of $7,505,000 on January 1, 1973.[18] We find and hold that the January 1, 1973, net asset value of HIC is $7,505,000.

The parties focused most of their energy on the dispute over the value of the 1976 gifts, and we are presented with a relatively meager record concerning the value of the interests in HIC transferred in 1973. After a careful study of that record, and for the reasons set out in our discussion of Issue 4, we conclude that the discount from net asset value we applied in valuing the 1976 gifts is also appropriate in valuing the 1973 gifts.

We found the January 1, 1973, net asset value of HIC to be $7,505,000. One-sixth of this amount, or $1,250,833.34, is attributable to the interest given by Belva to Bud and Jack, and one-eighteenth, or $416,944.44, is attributable to the interests given by Bud and Virginia and by Jack to Suzanne.[19] Discounting these amounts by 50 percent gives values for purposes of the gift tax of $625,416.67 for a one-sixth interest,[20] and $208,472.22 for a one-eighteenth interest.[21]

---

[18]This amount is the sum of HIC's cash assets ($105,000) and the net value of its timber and land as found by Kevin ($7,400,000).

[19]Bud and Virginia each gave Suzanne a one seventy-second interest, and Jack gave her a one thirty-sixth interest.

[20]Respondent does not contend that the $573,365 promissory note received by Belva on January 1, 1973, from Bud and Jack in exchange for her one-sixth interest in HIC had a fair market value lower than its face value. Belva thus made a gift to Bud and Jack of $625,416.67 − $573,365 = $52,051.67.

[21]Of this amount, $104,236.11 represents a gift made by Jack to Suzanne, and the remainder represents gifts of $52,118.05 made, respectively, by Bud and Virginia to Suzanne.

### Issue 6. Are the Savings Clauses in the Harwood Trust Agreements Enforceable?

On December 29, 1976, Jack and Margaret Harwood and Bud and Virginia Harwood each created a trust for the benefit of their respective children, with the Bank of America acting as trustee for each trust. Each trust received from its grantors an 8.89-percent limited partnership interest in HIC. The trust agreements contained the following clause:

Article FIRST. Property subject to this instrument listed in Schedule "A" is referred to as the "trust estate" and shall be held, administered, and distributed in accordance with this instrument. In the event that the value of the partnership interest listed in Schedule "A" shall be *finally determined* to exceed $400,000 for purposes of computing the California or United States Gift Tax, and in the opinion of the Attorney for the trustee a *lower value is not reasonably defendable*, the trustee shall immediately execute a promissory note to the trustors in the usual form at 6 percent interest in a principal amount equal to the difference between the value of such gift and $400,000. The note shall carry interest and be effective as of the day of the gift. [Emphasis supplied.]

Petitioners contend, relying on *King v. United States*, 545 F.2d 700 (10th Cir. 1976),[22] that the savings clause in each trust agreement effectively avoids any gift tax upon the transfer of property to the trusts to the extent that the value of such property exceeds $400,000 per trust. Respondent takes the opposite position, relying on *Commissioner v. Procter*, 142 F.2d 824 (4th Cir. 1944), cert. denied 323 U.S. 756 (1944).

In *King v. United States, supra*, the taxpayer created trusts for the benefit of his four children, with his lawyer as trustee. He then sold stock in his closely held corporation to the trusts, retaining the stock as security for payment of the purchase price, and the four trusts executed notes for $2 million based upon a per share price of $1.25. Letter agreements were drawn up, providing that (545 F.2d at 703–704):

if the fair market value of The Colorado Corporation stock as of the date of this letter is ever *determined by the Internal Revenue Service* to be greater or less than the fair market value determined in the same manner described above, the purchase price shall be adjusted to the fair market value determined by the Internal Revenue Service. [Emphasis supplied.]

---

[22]Petitioners also cite *Estate of Dickinson v. Commissioner*, 63 T.C. 771 (1975). We do not believe that case is relevant to the dispute at hand.

The Colorado Corp. was subsequently adjudicated bankrupt.

The Internal Revenue Service determined that Colorado Corp. stock was worth $16 per share at the date of transfer, and assessed a gift tax on the value of the stock in excess of the face value of the notes. It does not appear that any adjustment of the purchase price was made by the trust.

The Tenth Circuit reasoned that the clause in the letter set above indicated that the parties in good faith meant the transferred stock to be priced at market value (545 F.2d at 706):

> The IRS contention that the price adjustment clause violates public policy in that it deters administrative enforcement of the gift tax provisions is valid *only* if the transaction be construed as an *inter vivos* transfer undertaken to reduce King's estate. The IRS argument would be applicable if we were to hold that the trial court's finding that King intended that the trust pay full and adequate consideration predicated upon the price-adjustment proviso is clearly erroneous. It is not. *Under the facts found, King is not subject to the gift tax under Treas. Reg. sec. 25.2512–8 because the transaction was made in the ordinary course of business at arm's length, free from any donative intent. We hold that the trial court did not err in holding that the aforesaid stock transfers are not subject to a gift tax.*[23] [Emphasis supplied.]

The Tenth Circuit also stated that the gift tax was designed to prevent taxpayers from using gifts to reduce their taxable estates, and, evidently concluded that since the Colorado Corp. had been adjudicated bankrupt, the taxpayer's estate was in no way reduced by the earlier transfer of shares of Colorado Corp. stock to the trusts.

*Commissioner v. Procter, supra*, also involved a gift to a trust. The trust agreement of the donee trust contained a clause which provided (142 F.2d at 827):

> Eleventh: The settlor is advised by counsel and satisfied that the present transfer is not subject to Federal gift tax. *However, in the event it should be determined by final judgment or order of a competent federal court of last*

---

[23]We question whether the buyer's willingness to pay whatever amount the IRS determined the stock to be worth evidences an arm's-length transaction. If anything, it tends to show that the trustee did not bargain at arm's length with the trust grantor, since the trustee evidently did not care what price it paid for the stock, but cared only that no gift tax be incurred by the grantor-seller. In any event, the savings clause before us in the instant case does not evidence an intent by the grantors that there be an arm's-length sale of any value exceeding $400,000, since it makes any price adjustment turn on the trustee's judgment as to whether a lower value is defensible. Obviously, it was not in the sellers' (grantors') interest to allow the trustees this discretion, and we conclude that the grantors agreed to this clause only to avoid gift taxes, and not to insure an arm's-length sale.

*resort that any part of the transfer in trust hereunder is subject to gift tax, it is agreed by all the parties hereto that in that event the excess property hereby transferred which is decreed by such court to be subject to gift tax, shall automatically be deemed not to be included in the conveyance in trust hereunder and shall remain the sole property of Frederic W. Procter free from the trust hereby created.* [Emphasis supplied.]

The taxpayer argued that this clause rendered the gift in question ineffective to the extent that it gave rise to a gift tax.

The Fourth Circuit rejected this argument (142 F.2d 827–828):

We do not think that the gift tax can be avoided by any such device as this. Taxpayer has made a present gift of a future interest in property. He attempts to provide that, if a federal court of last resort shall hold the gift subject to gift tax, it shall be void as to such part of the property given as is subject to the tax. This is clearly a condition subsequent and void because contrary to public policy. A contrary holding would mean that upon a decision that the gift was subject to tax, the court making such decision must hold it not a gift and therefore not subject to tax. Such holding, however, being made in a tax suit to which the donees of the property are not parties, would not be binding upon them and they might later enforce the gift notwithstanding the decision of the Tax Court. It is manifest that a condition which involves this sort of trifling with the judicial process cannot be sustained.

The condition is contrary to public policy for three reasons: In the first place, it has a tendency to discourage the collection of the tax by the public officials charged with its collection, since the only effect of an attempt to enforce the tax would be to defeat the gift. In the second place, the effect of the condition would be to obstruct the administration of justice by requiring the courts to pass upon a moot case. If the condition were valid and the gift were held subject to tax, the only effect of the holding would be to defeat the gift so that it would not be subject to tax. The donor would thus secure the opinion of the court as to the taxability of the gift, when there would be before the court no controversy whatever with the taxing authorities which the court could decide, the only possible controversy being as to the validity of the gift and being between the donor and persons not before the court. Cf. Lord v. Veazie, 8 How. 251, 12 L.Ed. 1067; Van Horn v. Kittitas County, C.C., 112 F. 1. As was well said by Chief Justice Taney in Lord v. Veazie, supra [8 How. 255, 12 L. Ed. 1067][sic]:

"It is the office of courts of justice to decide the rights of persons and of property, when the persons interested cannot adjust them by agreement between themselves, —and to do this upon the full hearing of both parties. And any attempt, by a mere colorable dispute, to obtain the opinion of the court upon a question of law which a party desires to know for his own interest or his own purposes, when there is no real and substantial controversy between those who appear as adverse parties to the suit, is an

abuse which courts of justice have always reprehended, and treated as a punishable contempt of court."

In the third place the condition is to the effect that the final judgment of a court is to be held for naught because of the provision of an indenture necessarily before the court when the judgment is rendered. It should be remembered that it is not possible to obtain a declaratory judgment from a federal court as to whether the gift in question is subject to the gift tax. 28 U.S.C.A. sec. 400; Wilson v. Wilson, 4 Cir., 141 F.2d 599. The only way, therefore, in which it could be determined by "final judgment" of a federal court of last resort that any part of a transfer was subject to a gift tax would be for a tax to be assessed by the Commissioner and upheld by such court in the course of legal proceedings instituted for its enforcement or for its recovery after payment. This final judgment would fix the liability of the donor for the tax; and only then could the condition become operative. The condition, however, could not be given the effect of invalidating a judgment which had been rendered when the instrument containing the condition was before the court, since all matters are merged in the judgment. To state the matter differently, the condition is not to become operative until there has been a judgment; but after the judgment has been rendered it cannot become operative because the matter involved is concluded by the judgment.

We do not believe that the savings clause here under consideration falls within the ambit of *Procter*. The clause in issue provides that if the value of the gifts of interests in HIC are "finally determined to exceed $400,000 for purposes of computing the * * * United States Gift Tax, and in the opinion of the Attorney for the trustee a lower value is not reasonably defendable," the trustees shall execute notes to the respective grantors for any value in excess of $400,000. *Procter* is apposite only if we read the words "finally determined" to refer to a final judgment by a court of competent jurisdiction. Such an interpretation, however, would render a nullity the succeeding phrase "and in the opinion of the Attorney for the trustee a lower value is not reasonably defendable," since it would be absurd for the trustee to defend a lower value after a final judgment had been rendered.[24]

We believe the more reasonable interpretation of the clause at issue is to read "finally determined" to mean either

_____

[24]We note that the California Civil Code provides:

"EFFECT TO BE GIVEN TO EVERY PART OF CONTRACT. The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other. [Cal. Civ. Code sec. 1641 (West 1973).]"

See also Cal. Civ. Proc. Code sec. 1858 (West 1983) to the same effect; *Newby v. Anderson*, 36 Cal. 2d 463, 224 P.2d 673, 677 (1950); *Simons v. Young*, 93 Cal. App. 3d 170, 155 Cal. Rptr. 460, 466 (1979).

"eventually determined by appraisers"[25] or "determined by the IRS." Thus, if an appraisal of HIC or, alternatively, an IRS determination, was received by the trustees which valued the donated interests at more than $400,000 each, and the trustees accepted such appraisal, the trustees were to execute promissory notes to the trust grantors in an amount sufficient to insure that no more than $400,000 worth of property was given to each trust.

On this reading of the savings clause, the trustee has no power to issue notes to the grantors[26] upon a determination by a court that the value of property transferred to the trustee exceeded $400,000. We are thus not presented with the question whether a savings clause similar to that considered in *Procter* can serve to avoid gift tax on a transfer that is otherwise a taxable gift.

*King v. United States, supra,* is also distinguishable from the instant case. Whether we read the savings clause as allowing the trustees of the Harwood Family Trusts to issue promissory notes to the trustors in the event that the IRS determined the value of the 8.89-percent limited partnership interests in HIC exceeded $400,000 each, or upon receipt of an appraisers' report, the fact remains that the trustees did not issue such notes. No notes were issued in *King* either, but, there, issuing notes would have been an empty formality, since the trust corpus—shares in the bankrupt Colorado Corp.—was worthless by the time of trial. The Tenth Circuit in *King* evidently relied on this fact in reaching its holding on this issue:

> Significantly, [sic] we believe, is the fact that perhaps the main purpose of the gift tax was to prevent or compensate for the avoidance of death taxes by taxing the gifts of property inter vivos which, but for the gifts, would be subject in its original or converted form to the tax laid upon transfers at death. *Sanford's Estate v. Commissioner,* 308 U.S. 39, 60 S.Ct. 51, 84 L.Ed. 20 (1939). No such risk is involved in the instant case. 545 F.2d at 706.[27]

---

[25] At the time the agreement containing this clause was executed, the petitioners had commissioned Kleiner to appraise HIC for purposes of facilitating the transfer of interests in HIC to the trusts.

[26] In *Commissioner v. Procter,* 142 F.2d 824 (4th Cir. 1944), the trustee was to return the transferred property to the donor, rather than issue a note.

[27] Since the court had no way of knowing whether a note would ever be issued by the trustee, this statement is correct only if the Colorado Corp. was bankrupt at the time of trial.

In the instant case, we have found that the interests in HIC held by the Harwood Family Trusts were worth substantially in excess of $400,000.

The trustees were aware (we assume) of the Kleiner report and the IRS's gift tax determination, but they evidently believed that a value lower than the appraised value and the value determined by IRS was defensible, and did not issue promissory notes to the trust grantors. There, we believe, the matter ends, since we do not believe the savings clause in issue requires (or entitles) the trustees to issue promissory notes to the trust grantors in the event of a court judgment finding a value above $400,000 for the limited partnership interests given to the trusts.[28]

We hold that the savings clause in the Morris J. Harwood 1976 Family Trust and the Arthur H. Harwood 1976 Family Trust has no effect on the amount of the gifts we have otherwise determined were made to the trusts by petitioners herein.[29]

*Decision will be entered under Rule 155.*

---

[28]It might be thought that *King v. United States*, 545 F.2d 700 (10th Cir. 1976), should control because no diminution of petitioners' estates will occur if we find that neither trust received a gift in excess of $400,000, since arguably they will be compensated by the trusts for any amount that the value of the interests in HIC donated to the trusts exceeded $400,000. Since we have no guarantee that the trusts will ever issue notes to petitioners, and, indeed, since on our reading of the trust instruments the time for issuing notes is past, we are unable to accept this position.

[29]We express no opinion as to what result we would have reached had the trustees issued notes to the grantors, or had HIC been bankrupt at the time of trial, or had the savings clause required the issuance of notes if a final judgment by a court found that the interests in HIC donated to each trust had values in excess of $400,000.