T.C. Memo. 2001-229


UNITED STATES TAX COURT


ESTATE OF PATTIE WELDER EDWARDS, DECEASED, OAKES DAVID EDWARDS,
 JR., AND PATRICIA EDWARDS CARSON, CO-EXECUTORS, Petitioner v.
         COMMISSIONER OF INTERNAL REVENUE, Respondent


     Docket No. 10172-99.              Filed August 23, 2001.


     Terrell W. Dahlman and Frederick F. Rogers, Jr., for

petitioner.

     Gerald L. Brantley, for respondent.


          MEMORANDUM FINDINGS OF FACT AND OPINION


     COHEN, Judge:  Respondent determined a deficiency of

$523,771 in the 1994 Federal estate tax of the estate of Pattie

Welder Edwards (the estate).  After concessions, the issue for

decision is whether the ranch properties owned by decedent at her

date of death were encumbered by oral options that extended the existing leases on the ranch properties and, if so, whether the oral options or the existing leases were a restriction on the sale or use of the ranch properties that should be disregarded for estate tax valuation purposes under section 2703.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect on the date of decedent's death, and all Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulated facts are incorporated in our findings by this reference.

Pattie Welder Edwards (decedent) died on December 20, 1994. At the time of her death, decedent was a resident of Nueces County, Texas. Decedent's children, Oakes David Edwards, Jr. (Edwards), and Patricia Edwards Carson (Carson), are the coexecutors of the estate. At the time of filing of the petition, Edwards resided in Sinton, Texas, and Carson resided in Mountain Home, Texas.

Decedent devised her jewelry, personal property, and the remainder of her estate to her children, Edwards and Carson, in equal shares. The last will and testament of decedent dated July 27, 1988, states in part:

> I GIVE, DEVISE and BEQUEATH all the rest, residue and remainder of my estate, whether real, personal or

mixed, and wheresoever situated, including all property which I may acquire after the execution of this Will, to my children, O.D. EDWARDS, JR. and PATRICIA CARSON EDWARDS [sic], in equal shares, per stirpes.

On the date of decedent's death, decedent owned 8,728.75 acres of land located in San Patricio, Texas (the Sinton Ranch) and an undivided 50-percent interest in 11,751 acres of land located in La Salle County, Texas (the Cotulla Ranch).  Edwards and Carson each owned an undivided 25-percent interest in the Cotulla Ranch.

Prior to decedent's death, decedent executed written lease agreements to lease the Sinton Ranch to Edwards.  On May 16, 1985, decedent, individually and as trustee, leased the Sinton Ranch to Edwards for a duration of 1 year, with four 1-year renewal options.  On October 19, 1989, decedent executed a lease (the existing lease) on the Sinton Ranch with Edwards for a duration of 1 year, with five 1-year options to renew.  The existing lease was effective on decedent's date of death and would have expired on October 31, 1995.  The existing lease provided for ranching lease payments in the amount of $65 per year per bull or cow, or cow and calf unit, pastured on the land, with a minimum total payment of $15,300, and a rental payment of $20 per acre (3,243.06 acres) for farmland.  The terms also prohibited amendment, modification, or alteration unless written and signed by the party against whom enforcement would be sought.

Prior to decedent's date of death, decedent executed written lease agreements to lease her undivided 50-percent interest in the Cotulla Ranch to Carson and her husband (the Carsons). On March 1, 1985, decedent, Edwards, and Carson, as co-owners, leased the Cotulla Ranch to the Carsons and Fred M. Rhodes for a duration of 1 year, with four 1-year options to renew. On March 1, 1986, the Cotulla Ranch was leased to the Carsons for a duration of 1 year, with four 1-year options to renew. On August 24, 1994, decedent executed a lease (the existing lease) on the Cotulla Ranch with the Carsons that had an effective date of March 1, 1993, and provided for a duration of 2 years with three 1-year options to renew. The existing lease was effective on decedent's date of death and would have ended on February 28, 1998. The existing lease provided for ranching lease payments in the amount of $60 per year per bull or cow, or cow and calf unit, pastured on the land, with a minimum total payment of $20,000. The terms also prohibited amendment, modification, or alteration unless written and signed by the party against whom enforcement would be sought.

After the death of decedent, Edwards and Carson, as coexecutors, executed on behalf of decedent's estate a "Memorandum of Lease Agreement" (postdeath lease) on the Sinton Ranch that states:

> WHEREAS, in reliance upon the representations and promises of Ms. Edwards, and with her specific

knowledge and consent, the Lessee had, prior to her death, maintained a substantial cattle and farming operation and had, in addition, expended substantial sums of his own funds, as well as his time and effort, in erecting and maintaining permanent improvements on the Property without compensation from Ms. Edwards, all of which were intended to be used by the Lessee indefinitely; and

WHEREAS, Ms. Edwards died on December 20, 1994, at which time the Lease was in full force and effect, and the Estate (in recognition of Ms. Edwards' promise and commitment) and the Lessee now wish to memorialize the terms and conditions of the lifetime lease of the Property by the Lessee; * * *

Similar language was included in the lease agreement (postdeath lease) executed on the Cotulla Ranch by Edwards and Carson, as coexecutors, after the death of decedent.

The terms of the postdeath lease on the Sinton Ranch extended the existing lease for a period of 5 years, with consecutive 5-year options to renew the lease at a fair market rental value. The terms of the postdeath lease on the Sinton Ranch also provided for: (1) Lease payments for ranchland in the amount of 30 percent of the offspring of any cattle or other livestock pastured on the property, (2) payments for use of farmland in the amount of one-third of the grain and one-fourth of the cotton and cottonseed produced therefrom, (3) payment in kind, and (4) 25 percent of the gross hunting fees received by the lessee from hunters.

The terms of the postdeath lease on the Cotulla Ranch extended the existing lease for a period of 5 years, with

consecutive 5-year options to renew the lease at a fair market rental value. The postdeath lease set the initial rent at $7.50 per acre annually and $12,000 annually per each residence located on the land. The postdeath lease on the Cotulla Ranch allowed hunting on the leased properties with the express written consent of the lessors. Hunting had been prohibited in all prior written leases because decedent was adamant that the ranchlands would not be used for hunting.

The estate reported the fair market value of the Sinton Ranch at $2.6 million on its Form 706, United States Estate (and Generation-Skipping Transfer) Tax Return, Schedule A, Real Estate. The real estate appraisal report that was prepared by Thomas F. Dorsey (Dorsey) and submitted with the estate's Form 706 concluded that the unencumbered fair market value of decedent's interest in the Sinton Ranch on decedent's date of death was $4,150,000 and that the fair market value of the Sinton Ranch encumbered by the postdeath lease was $3,350,000. In the notice of deficiency, respondent determined that the fair market value of the Sinton Ranch on the date of decedent's death was $4,150,000. Respondent reduced the value by $750,000 for a valid election under section 2032A.

The estate reported the fair market value of the interest in the Cotulla Ranch on Form 706, Schedule A, at $1,070,000. The real estate appraisal report that was prepared by Dorsey and

submitted with the estate's Form 706 concluded that the unencumbered fair market value of decedent's interest in the Cotulla Ranch on decedent's date of death was $1,380,000 and that the fair market value of the Cotulla Ranch encumbered by the postdeath lease was $1,070,000. In the notice of deficiency, respondent determined that the fair market value of the Cotulla Ranch on the date of decedent's death was $1,380,000.

In addition to respondent's determination of the fair market value of the ranch properties at decedent's date of death, respondent determined in the notice of deficiency:

> It is also determined that section 2703 of the Internal Revenue Code applies to any lease or lease options which the decedent may have had with her children on the ranches * * *. Accordingly, the values of Schedule A * * * should be determined without regard to such leases or lease options, if any. Furthermore, the leases and/or lease options were not valid under state law. Similarly, they were not bona fide business transactions but devices intended to avoid federal transfer taxes. In effect the alleged leases and/or options to lease were shams. Accordingly, the reported value of the gross estate is increased $1,110,000.00 * * *.

## OPINION

The issue presented is whether the ranch properties that were owned by decedent at her date of death were encumbered by oral options that extended the existing leases on the ranch properties and, if so, whether the oral options or the existing leases were a restriction on the sale or use of the ranch

properties that should be disregarded for estate tax valuation purposes under section 2703.

The value of a decedent's gross estate includes the value of all of the decedent's interest in property.  Secs. 2031, 2033. The value of property is the fair market value at the date of the decedent's death.  Sec. 20.2031-1(b), Estate Tax Regs.  The fair market value of property is defined as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts".  Id. Intrafamily agreements must be subjected to greater scrutiny than that afforded similar agreements between unrelated parties.  See Harwood v. Commissioner, 82 T.C. 239, 259 (1984), affd. without published opinion 786 F.2d 1174 (9th Cir. 1986); Estate of Tiffany v. Commissioner, 47 T.C. 491, 499 (1967).

Section 2703(a) provides guidance on the valuation of properties that are subject to restrictions and states:

> SEC. 2703(a).  General Rule.--For purposes of this subtitle, the value of any property shall be determined without regard to--
>
> (1) any option, agreement, or other right to acquire or use the property at a price less than the fair market value of the property (without regard to such option, agreement, or right), or
>
> (2) any restriction on the right to sell or use such property.

Section 25.2703-1(d), Gift Tax Regs., uses the following example to illustrate that a lease constitutes a restriction on the use of property under section 2703:

> Example (1). T dies in 1992 owning title to Blackacre. In 1991, T and T's child entered into a lease with respect to Blackacre. At the time the lease was entered into, the terms of the lease were not comparable to leases of similar property entered into among unrelated parties. The lease is a restriction on the use of the property that is disregarded in valuing the property for Federal estate tax purposes.

The estate contends that, prior to decedent's death, decedent granted oral options to Edwards and Carson that extended the duration of the existing leases on the ranch properties and that these oral options, as memorialized in the postdeath leases, were a restriction on the sale or use of the properties at decedent's date of death that reduced the value of decedent's interest in the ranches for estate tax purposes. The estate asserts that the oral lease options were valid and enforceable under Texas law on the date of decedent's death.

Respondent contends that decedent did not grant her children the oral options, as memorialized in the postdeath leases, that extended and modified the existing leases on the Sinton Ranch and Cotulla Ranch. Respondent argues: (1) The estate has presented no evidence that the oral options were granted by decedent; (2) the oral options are contrary to decedent's practice of executing written leases with her children; and (3) the lease

terms of the existing leases and Texas law required extensions and modifications of the lease agreement to be in writing.

Respondent further argues that the postdeath leases were created to reduce the value of decedent's assets for estate tax purposes because Edwards and Carson were both the coexecutors and devisees of decedent's estate and, as the owners of the ranch properties, would not have to lease the ranch property from themselves to maintain control over the ranch properties and continue their ranching operations. The estate argues that there was a bona fide business purpose in executing the leases, which was to maintain managerial control over the ranch properties. The estate explains that Edwards and Carson, the devisees of the ranch properties, would have joint ownership of both the ranch properties, as coexecutors and devisees, whereas the purpose of the leases was to grant an exclusive possessory right to a particular ranch property to each child.

Based on the testimony offered by the estate, we are not persuaded that decedent granted oral options that extended the existing leases indefinitely. In regards to the oral options, Edwards testified on examination by the estate's counsel:

> Q    Now, Mr. Edwards, * * * beginning in 1985 was there ever any discussions with your mother, Mrs. Pattie Welder Edwards, about who was going to ranch Cotulla and who was going to ranch Sinton?
>
> A    Well--
>
> Q    And if so, when did it happen?

A     The way I understood it, I think it was always known that I was going to ranch Sinton because I lived there, I'd lived there all my life basically, had my home there, my wife had her studio, we were there and that's where I was ranching.

My sister--and she was ranching--not my sister, but Mother at that time was ranching Cotulla.  When she--when we bought her out--when she was sold out at Cotulla and they [the Carsons] took over Cotulla, the main thing was that my mother was worried * * * [Carson] felt like she'd been disenfranchised because she didn't have a place to go, and I was at Sinton, and I'd been there all my life, so she had her first chance to go and do Cotulla.

At first I was a little anxious about it, but after I--I felt better about it and they went to--they started ranching there.  And Mother's concern and my concern was if they like it--it suited me fine because I'd bitten off all I could chew right there at Sinton, financially and--A to Z at that time, and they were happy at Cotulla.  I was happy and I thought everything was going pretty good.

They'd come to Sinton and I'd go to Cotulla.  We'd meet going back and forth, and we weren't having any problems.  As a matter of fact it was one of the best things that we ever did as a family.

*     *     *     *     *     *     *

Q     Can you tell the Court the circumstances surrounding the execution of the memorandum of lease agreement?

A     All I know is when she died the other lease hadn't--I don't know when it came due, the other lease, but this is just a continuation of what had been going on within the family for years.

*     *     *     *     *     *     *

* * *  And when she died then we put all this in writing so my sister and I would understand, and everything's the way it was meant to be and I'm happy and she's happy * * *

The legal stuff is the legal stuff but I know what my mother meant and I know what my sister and I meant.

                *    *    *    *    *    *    *

Q    And would it be fair to describe your understanding of this agreement with your mother that you can't really put a specific date on when you--when the agreement was reached that you would be able to lease this for the rest of your life.  It was just something that was understood by you and your sister and your mother?

A    As far as putting an actual date * * *  No.

                *    *    *    *    *    *    *

A    It's a family deal, and you know when you're sitting and drinking coffee and whatever and talking to your mother you hear stuff.

Q    Sure.

A    And she says stuff, and I don't know how else to say this, but a fact's a fact.

On cross-examination, Edwards testified:

Q    Well, you do agree, do you not, in connection with that last question that the terms of the memorialized post-death leases were substantially different from the existing leases and the alleged oral options, don't you?

A    Yes.

Edwards acknowledged that the terms of the postdeath leases allowing hunting were not authorized by his mother and were contrary to her long-held adamant opposition to the use of the ranch properties for hunting.

Carson testified, in response to the estate's counsel:

Q    Have you been able to and can you identify a specific date certain or dates certain that you and

your mother discussed these options to continue leasing the properties?

     A    Well, as the years went on and Mother was getting older and as a mother myself, my mother as I would, want my children to always be equal. I would want to be equal. She wanted to be equal and fair with David and I. So she was very pleased at this point that we had a fair, equal operation, each of us, and she was happy that as she got older up until the last year before she died she said, This is something I would like to see you and your brother do for the rest of your lives.

And--

\*     \*     \*     \*     \*     \*     \*

    But it was an agreement, verbal agreement, but we were a close family. David and I were very close and my mother and I and David were very close, and this was her wish.

The estate asserts that Edwards and Carson "understood" from their discussions with decedent prior to her death that each had received a definite right and commitment from decedent to continue to lease their respective ranch properties for an indefinite time and each committed substantial resources to their ranching operations based on their understanding. The belief of Edwards and Carson as to what may have been the desire of their mother is not an oral option to lease land for an indefinite period of time. Decedent's desire to have her children continue the ranching operations on the Sinton Ranch and Cotulla Ranch is not equivalent to the granting of an oral option to her children to lease the ranch properties for an indefinite time. Decedent's desire to have her children continue the ranching operations was

provided for by decedent in her last will and testament that appoints her children to serve as coexecutors and devises her fee interest in the ranch properties to her children.

There is no persuasive evidence that decedent granted oral options to extend or to modify the existing lease terms or that the postdeath leases reflect the terms of oral options. The testimony does not identify any specific discussion among decedent, Edwards, and Carson where decedent granted the right to lease the ranch properties indefinitely to Edwards and Carson. Our conclusion that no oral agreement was made is supported by the following: (1) Decedent and her children had a history and pattern of executing written leases, (2) the postdeath leases contained different terms from existing leases, (3) the existing leases, including one executed only 4 months before decedent's death, required extensions and modifications to be in writing, and (4) decedent's children continued to maintain control over the ranch properties as the coexecutors and devisees of decedent's estate.

Because we have concluded that no oral options existed at the time of decedent's death, the postdeath leases are only agreements executed by Edwards and Carson as the coexecutors of decedent's estate subsequent to the date of decedent's death. The postdeath leases reflect only the arrangement between Edwards and Carson regarding the use of the ranch properties. Because

the oral options did not exist for the purpose of estate tax valuation, we need not address the parties' arguments regarding the validity and enforceability of the alleged oral options under Texas law or the impact of section 2703.

Decedent did not grant oral options prior to her death, and the postdeath leases were executed subsequent to decedent's death. The postdeath leases do not justify a discount on the ranch properties because the postdeath leases were not an encumbrance that existed at the moment of decedent's death. Cf. Estate of Proctor v. Commissioner, T.C. Memo. 1994-208.

Respondent argues that the existing leases must also be disregarded in determining the value of the properties on decedent's date of death under section 2703(a)(2). We need not address this argument because: (1) The estate does not identify the amount of the discount attributable to the existing leases on the ranch properties when valuing the ranch properties on its Form 706, (2) the various experts' reports do not place a separate value on the discount created by the existing leases, and (3) the estate maintains the position that the oral options were granted prior to decedent's death and supersede the existing leases. Thus there is no evidence that any discount is attributable to the existing leases. The unencumbered fair market values of the ranch properties at decedent's date of death

are the amounts to be included in decedent's gross estate under section 2031.

      To reflect the foregoing and concessions of the parties,

<u>Decision will be entered</u>

<u>under Rule 155.</u>